# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-DP-00541-SCT

*ERIC MOFFETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2006 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF CAPITAL DEFENSE COUNSEL BY: ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JASON LEWIS DAVIS MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 09/16/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Eric Moffett was convicted of capital murder.  Moffett was sentenced to death by lethal injection by a jury of his peers after the jury determined that the murder of a five-year-old child was: (1) committed while Moffett was engaged in felonious abuse and/or battery of a child; and (2) especially heinous, atrocious, or cruel.  Finding no reversible error, we affirm his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.     Felicia Griffin was sexually abused,[1] battered,[2] and murdered during the early morning hours of December 31, 1994. Felicia lived in Jackson with her two sisters; mother, Pennie Griffin; and, Pennie's boyfriend, Moffett. On December 30, 1994, Moffett, Pennie, and the three girls were at home. Moffett left the house at approximately 9:45 p.m. while Pennie was preparing to go to work. Pennie expected Moffett's mother, Florence Moffett Powell, to arrive soon to take her to work. When Powell did not timely arrive, Pennie went to a nearby gas station to phone her employer and Powell. Pennie checked on the children before leaving, and locked the door and burglar bars as she departed. After going by Pennie's home, Powell picked up Pennie at the gas station and proceeded to take Pennie to work. It was disputed at trial whether Powell was alone when she arrived at the gas station, or whether she was accompanied by her daughter, Sheritha Moffett. Sheritha testified that she had accompanied Powell and had observed Powell enter the house looking for Pennie. Powell did not testify, as she died before trial. The jury heard evidence that Moffett returned to the house a few hours later, took Felicia into the bedroom he shared with Felicia's mother, abused Felicia, and savagely raped her with his fingers and fist.

¶3.     Moffett reported Felicia's death via a 911 call and awaited the arrival of officers from the Jackson Police Department (JPD). After the police officers arrived, Moffett exhibited anger and began to behave strangely. His behavior escalated to the point that he was "out of control" and "throwing furniture, " according to the testimony of police officers. Four

---

[1]The perineum had been savagely ripped or torn, resulting in open communication of the excretory opening of the alimentary canal with her genital orifice.

[2]She had bruises on her neck, face, and left leg; and petechial hemorrhages on her face.

2

officers subdued Moffett. He was handcuffed and arrested. From his arrest on December 31, 1994, Moffett remained incarcerated until September 7, 1995, when a grand jury returned no true bill. Moffett was released the same day. He had been in custody 250 days.

¶4. Years later, a JPD cold-case unit reviewed the file and submitted its findings to the district attorney. Moffett was indicted in April 2002. Moffett was tried, convicted, and received a death sentence in February 2006. Substantial evidence was presented at trial, including the live testimony of numerous witnesses. Witnesses included, but were not limited to, Pennie Griffin; LaQuandia Griffin, the victim's sister; Donald Davis, a prison inmate; Mary Esther Pearson, a nurse practitioner; Huma Nasir, a forensic DNA analyst for a private DNA laboratory; and Detective Rod Eriksen, a JPD officer.

¶5. LaQuandia testified that she was seven years old at the time of the murder. The night of the crime, Pennie helped her and her sisters, Jessica and Felicia, get ready for bed and checked on them before she left for work. The three girls were sleeping on a pallet in a room across the hall from the bedroom shared by Pennie and Moffett. Lights were on in the girls' bedroom, the hallway, and bathroom. LaQuandia woke up and saw Moffett standing in the doorway of the girls' bedroom. She saw Moffett pick up Felicia, who was sleeping closest to the door. He took Felicia to his bedroom. He did not close the doors all the way, so she could see him. He placed Felicia down on the bed and started touching and rubbing on her chest and stomach areas. She heard Felicia making "all kind of painful cries." She then dozed off, only to be awoken later. She saw someone[3] in the hallway going into Pennie's bedroom. She remembered looking into the bedroom and seeing Felicia "laying in the bed

---

[3]This person was later determined to have been a paramedic.

3

and the covers were real bloody." After the police arrived, Moffett approached her, hugging and attempting to reassure her. She recalled seeing Moffett "throw a fit, . . . he was . . . yelling and screaming, . . . picking up chairs and . . . throwing things as if he cared." She saw the paramedics take Felicia away on a stretcher. She was not sure what she told the policeman who questioned her about the murder, but she did recall being afraid to tell him about Moffett, as he was still in the house at the time.

¶6. Donald Davis, an inmate with Moffett during the 1994-95 confinement, testified. During his testimony, he read a statement he had written on September 15, 1995,[4] when he was interviewed by a JPD officer at the Hinds County Detention Center. Moffett had confessed the crime to Donald Davis at a Bible study on September 3, 1995. The confession had included graphic details of the crime and Moffett's attempt to seek forgiveness by inflicting injury upon himself (smashing his hand in a steel door at the detention center).

¶7. Mary Esther Pearson testified that she was a nurse practitioner who provided medical services to inmates at the detention center where Moffett was incarcerated. She testified that she treated Moffett in March 1995 for an injury to the middle and ring fingers of his right hand. Moffett told her he had "mashed [his fingers] in a door."

¶8. Huma Nasir testified about DNA tests performed on laboratory samples taken at the emergency room, at autopsy, and at the murder scene, as well as known samples drawn from Moffett. She stated that the vaginal swab, vaginal wash, and anal swab were all positive for semen on the presumptive test, but were negative for sperm cells on the confirmatory test, indicating that there were no "physical sperm cells" remaining in the semen samples. She

---

[4]This was after the no-bill report of the September 1995 grand jury.

4

testified at length about DNA tests done on cuttings from the bath towel found in the bed where Felicia had been found by paramedics. The towel was positive for semen and epithelial cells, but was negative for blood. There were two stains on the towel. The first was a semen stain and the other was a mixed stain, including semen and epithelial cells.[5] The semen stain was found to match Moffett's DNA on all fifteen markers. Nasir testified that there was less than one chance in five trillion, nine hundred billion (5,900,000,000,000)[6] that the semen had come from anyone other than Moffett. As for the mixed stain, neither Moffett nor Felicia could be excluded as the source of the two sets of DNA found there. There were matches on four foci and six alleles, which Nasir described as "weak" alleles. She stated that, from this evidence, more than 99.9% of the population could be excluded as possible donors of the two components, thus, there was less than one chance in a thousand that anyone else contributed to the mixed stain.

¶9. Pennie testified that, on the morning of December 30, 1994, she and Moffett had an argument and that he hit her "upside the head." She stated that, at that point, she decided to end the relationship with Moffett and that she wrote him a letter telling him that it was over. Police Lieutenant Rod Eriksen testified that the letter, which he saw as establishing a possible motive, was found in the bedroom where Felicia was found. The jury viewed a

---

[5]Epithelial cells include mucous, saliva, vaginal secretions, and skin, but not semen. Blood normally would be included in the epithelial portion, but not here, as the towel was found to be negative for blood.

[6]This is more than nine hundred times the estimated population of the entire world in 2006. Population Reference Bureau, 2006 World Population Fact Sheet 5 (chart), http://www.prb.org/pdf06/06worlddatasheet.pdf (last visited September 4, 2010).

5

videotape, taken as Eriksen and the crime-scene investigator carried out their investigation of the scene. The jury saw, *inter alia*, Eriksen discovering the letter at the scene.

¶10. Several other witnesses testified, including, but not limited to, an emergency room physician; an emergency medical technician; JPD officers, including detectives and crime scene investigators; and pathologists. Additional facts as relevant to each issue are provided *infra*.

## STANDARD OF REVIEW

¶11. We review convictions for capital murder under a heightened standard:

> [C]onvictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." **Balfour v. State**, 598 So. 2d 731, 739 (Miss. 1992). Under this method of review, all doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." **Id.** (quoting **Irving v. State**, 361 So. 2d 1360, 1363 (Miss. 1978)).

**Loden v. State**, 971 So. 2d 548, 562 (Miss. 2007) (quoting **Thorson v. State**, 895 So. 2d 85, 97 (Miss. 2004)) (citations omitted).

## ISSUES

¶12. Moffett raised the following nineteen assignments of error, *verbatim et literatim*.

I.      The trial court erred in failing to dismiss the capital charge against Moffett as a violation of the statute of limitations.

II.     The trial court erred in failing to dismiss the case against Moffett for violation of the speedy trial and due process clauses of the State and Federal Constitutions.

III.    The trial court erred in limiting the defense in the topics it could cover in voir dire.

IV.     The trial court erred in removing for cause jurors even though they were qualified to serve under Witherspoon.

6

V.      The trial court violated Moffett's state and federal constitutional right to present a defense when it prohibited evidence of "Third-Party Guilt" thereby depriving Moffett of a fundamentally fair trial.

VI.     Eric Moffett was denied his right to testify in his own defense where the trial court ruled that the prosecution could present a rebuttal witness but Moffett would not be allowed to offer evidence that contradicted that witness with prior inconsistent statements and results of the police investigation.

VII.    The trial court erred in allowing the prosecution to elicit unreliable hearsay evidence in violation of Moffett's confrontation rights and his right to a fair trial.

VIII.   The trial court erred in not allowing Moffett to introduce evidence that he was released from jail in 1995 without pending charges to rebut the false inference by the prosecution that his sister and mother were lying because they failed to come forward earlier to offer statements to the police.

IX.     The trial court erred in admitting exhibit 7, a highly prejudicial photograph with little or no evidentiary value.

X.      The trial court failed to safeguard Moffett's right to a trial by a fair and impartial jury by not removing juror Loper.

XI.     The trial court erred in denying proposed jury instructions D-11 and D-12.

XII.    The prosecutor deliberately solicited opinions of the victims concerning the appropriate punishment for appellant in violation of the Sixth, Eighth, and Fourteenth amendments to the Federal Constitution, Article 3, Sections 14, 26, and 28 of the Mississippi Constitution, Miss. Code Ann. §§ 99-19-101 and 105, and other applicable law.

7

XIII.      The trial court erred in allowing Steven Hayne to testify in violation of MRE Rule 702 and the Due Process Clause of the State and Federal Constitutions.

XIV.      The trial court erred in refusing instruction DS-10.

XV.      The trial court erred by refusing proposed instruction informing the jury that life was in their discretion, and that a jury always has the discretion to give a life sentence.

XVI.      The trial court erred in proceeding directly into the sentencing phase following the guilty verdict based on the unique circumstances of this case.

XVII.      The death sentence in this case must be vacated because the indictment failed to charge a death-penalty eligible offense.

XVIII.      Error in submitting and/or defining aggravating factors.

XIX.      Whether the cumulative effect of the errors in the trial court mandate reversal of the conviction or sentence of death.

## **ANALYSIS**

**I.      The trial court erred in failing to dismiss the capital charge against Moffett as a violation of the statute of limitations.**

¶13.   Moffett argues that, because he was indicted in 2002 on a charge of capital murder, Mississippi's two-year statute of limitations should bar his prosecution. The statute reads:

> The passage of time shall never bar prosecution against any person for the offenses of murder, manslaughter, aggravated assault, kidnapping, arson, burglary, forgery, counterfeiting, robbery, larceny, rape, embezzlement, obtaining money or property under false pretenses or by fraud, felonious abuse or battery of a child . . . , touching or handling a child for lustful purposes . . . , sexual battery of a child . . . , or exploitation of children . . . . A person shall not be prosecuted for any other offense not listed in this section unless the

8

prosecution for such offense be commenced within two (2) years next after the commission thereof. . . .

Miss. Code Ann. § 99-1-5 (Rev. 2007). Moffett concedes that numerous offenses are exempted from the two-year rule and are not subject to any statute of limitations. However, he argues that capital murder is a separate and distinct crime, which is not explicitly excepted; thus, the two-year rule should apply by default.

¶14. The trial court found that Moffett's argument was "without a legal or factual basis," as "capital murder does not have a statute of limitations," and denied the motion. The trial court's rationale was that (1) capital murder "involves the killing and/or murder of someone . . . while in the commission of another felony"; and (2) the Legislature, by including the term "murder," as well as other serious offenses, intended to include capital murder, a crime more serious than murder. *See* Miss. Code Ann. §§ 97-3-19 (Rev. 2006), 99-1-5 (Rev. 2007).

¶15. This Court found in *De La Beckwith v. State*, 707 So. 2d 547 (Miss. 1997), that:

> [t]here is no statute of limitations on murder. The legislature, in excepting certain crimes from the general statute of limitations imposed on criminal prosecutions by Sec. 99-1-5, Miss Code Ann. (1972), recognized that these crimes are so serious and the implications to public safety so great that prosecution should not be barred merely by the passage of time.

*Id.* at 569. However, *De La Beckwith* was a prosecution for murder, not capital murder, as the capital murder statute did not exist at the time of that crime.

¶16. Prior to *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the death penalty was a possible penalty after a conviction for murder. *See Peterson v. State*, 268 So. 2d 335, 338 (Miss. 1972). Even though *De La Beckwith* was not a capital-murder

9

case, its rationale is apt. *See De La Beckwith*, 707 So. 2d at 569. No reasonably minded person can quarrel that capital murder is indeed a serious offense, with great implications to public safety. The trial court astutely applied the statute, finding that the definitions of "murder" and "capital murder" begin with the same language: "The killing of a human being without the authority of law by any means or in any manner . . . ." Miss. Code Ann. § 97-3-19 (Rev. 2007). The trial court further found, as evidence of legislative intent, that, at the time of passage of the statute of limitations, capital punishment was one of the possible sentences after a conviction for murder.

¶17. The issue, as raised, is one of first impression in Mississippi. However, the courts of Texas have dealt with the same issue. *See Fearance v. State*, 771 S.W.2d 486, 494-95 (Tex. Crim. App. 1988). Fearance made the same argument as Moffett, *i.e.*, that the statute excepts "murder," but makes no specific provision for "capital murder." *See id.*; Tex. Code Crim. Proc. Ann. Art. 12.01; Miss. Code Ann. § 99-1-5 (Rev. 2007). The *Fearance* court held that "'[c]apital murder is a species of murder and as such is provided for by Art. 12.01(1).' Therefore, there is no limitation for the offense of capital murder." *Fearance*, 771 S.W.2d at 495 (quoting *Demouchette v. State*, 731 S.W.2d 75, 80 (Tex. Crim. App. 1986)). *See also Wright v. State*, 28 S.W.3d 526, 531 (Tex. Crim. App. 2000) (*superceded by statute on another issue*). We expressly find there is no statute of limitations for capital murder.

      II.        **The trial court erred in failing to dismiss the case against Moffett for violation of the speedy trial and due process clauses of the State and Federal Constitutions.**

¶18.    Moffett was first arrested and charged with capital murder on December 31, 1994.

After a preliminary hearing in Hinds County Court on February 7, 1995, he was bound over

for grand-jury action.  Moffett remained in custody until a grand jury issued a no-bill on

September 7, 1995.  He was released the same day.

¶19.    During the same time frame, a fellow inmate, Don Davis, was attempting to contact

the district attorney's office.  A letter from Don Davis to an assistant district attorney was

postmarked September 13, 1995.  In the letter, Don Davis claimed that Moffett had revealed

to Davis information regarding Felicia's death.  Detective Tony Davis, an officer in the JPD

Sex Crimes Unit, testified that his supervisor directed him on September 15, 1995, to take

Don Davis's statement.  The detective recorded the conversation and had Don Davis write

out a statement as well.  The detective logged the written statement and the cassette tape into

the evidence file, and reported back to his supervisor.  He never discussed the results of his

assignment with any other officers.

¶20.    Officers in the JPD cold-case unit reviewed the file years later, including Don Davis's

statement.  In 2002, the case was presented to a grand jury, which indicted Moffett on April

9, 2002.  Moffett was arrested the same day.

¶21.    During Moffett's second incarceration (2002-2006), twelve separate trial settings were

continued for one reason or another.   Two defense attorneys made appearances, but later

withdrew as Moffett's counsel.  Moffett also filed two *pro se* motions.  After Moffett was

arraigned on May 31, 2002, a trial was set for July 23, 2002.  The defense requested and was

granted a continuance.  The next eight continuances were by six agreed orders and two for

crowded dockets.  The tenth setting (August 9, 2004) was continued by "Agreed Order of

11

Continuance until DNA testing is Complete." At a docket call in December 2004, the State announced that it would not seek the death penalty. The eleventh continuance (January 24, 2005), was caused by delays in DNA testing. DNA results were obtained in February 2005, and an additional DNA test was conducted in May 2005. Subsequently, the State announced that it would seek the death penalty. The defense moved to enforce the earlier announcement not to seek the death penalty. The twelfth setting was cancelled after Moffett moved on May 9, 2005, to dismiss for failure to provide a speedy trial. The Court heard arguments on both motions on June 24, 2005.

¶22. In the motion to dismiss, Moffett argued that he had been denied a speedy trial as guaranteed by the United States and Mississippi Constitutions. *See* U.S. Const. VI; U.S. Const. amend. XIV, § 1; Miss. Const. art. 3, §§ 14, 26. Although citing the due-process clauses, he argued only the right to a speedy trial. Moffett argued that the right to a speedy trial had attached upon his initial arrest and had remained with him until he filed a motion to dismiss more than ten years later. He argued that: (1) a ten-year delay is presumptively prejudicial, triggering a full *Barker* analysis; (2) the State had the burden to show good cause for delay; (3) he could not be faulted for not asserting the right before he was indicted; and (4) he was prejudiced: (a) because the file with the results of his first attorney's research into an alibi defense had been lost, and (b) by the State's use of Don Davis's statement, which had been available to it since 1995, and that by negligence or design, the State had failed to use it earlier. *See Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192, 33 L. Ed. 2d 101 (1972) (identifying four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant").

12

¶23. The State agreed that a speedy-trial right had attached upon Moffett's arrest and that the **Barker** analysis was appropriate for the time in 1995 when Moffett was incarcerated. However, the State countered that, once Moffett was released, **Barker** became inapplicable, as no charges were pending and Moffett was living as a free man. According to the State, for this period of time, the appropriate analysis is under the Due Process Clause of the Fifth Amendment to the U.S. Constitution. *See* U.S. Const. amend. V. The State conceded that, once Moffett was indicted and taken into custody, the proper analysis should shift back to Moffett's Sixth-Amendment right to a speedy trial.

¶24. For the first incarceration in 1995, the State argued that a full **Barker** analysis was unnecessary, as the length of delay (250 days), was not presumptively prejudicial, being less than 270 days. Nevertheless, the State responded to the other factors, as follows: Factor 2 – reason – the delay had not been unduly long, considering the volume of physical evidence that had to be tested; Factor 3 – assertion – Moffett had not asserted his right to a speedy trial; Factor 4 – prejudice – Moffett had not been prejudiced by the delay.

¶25. Regarding the period between the no-bill (September 1995) and the indictment (April 2002), the State argued that Moffett had the burden of showing that the delay in indictment had caused him actual prejudice and was by the intentional device of the government to obtain tactical advantage. Regarding the actual-prejudice element, the State argued that "[v]ague assertions of lost witnesses" were insufficient to show a due-process violation. **De La Beckwith**, 707 So. 2d at 570. The State submitted that Moffett, to meet his burden, would have to list the names of the people he could not find, rather than rely on an attorney's vague recollection of investigating an alibi defense. Regarding the intentional-device prong, the

13

State argued that the case had been revived, not through an intent to gain advantage, but only because of the work of JPD's cold-case unit, which had reopened the case.

¶26.    During the second incarceration, by the State's count, 1,155 days elapsed from Moffett's arrest to the expected trial date. The defense conceded that "some, though not all, of the post-2002 delay could arguably have been attributed to continuances sought by the defendant . . . ." The State attributes only the first ninety days to itself.  These ninety days began upon indictment, continued through Moffett's arraignment, and ceased on July 3, 2002, the day Moffett's first attorney withdrew.  In its reply to Moffett's motion, the State offered the following rationale for not analyzing the other **Barker** factors:

> The rest of the days from 7/3/2002 until 8/8/2005 are either covered by defense continuances, changing of defense counsel . . . crowded docket situations or waiting for DNA results. . . .  Ninety days is not presumptively prejudicial [as] the delay must be over 270 days. . . .  Therefore, this factor should not be counted against the State . . . and the analysis should end at this point.

During oral argument before the trial court, the State addressed the other **Barker** elements, including that Moffett had never asserted his right to a speedy trial, except through the motion to dismiss, which was filed after he had been in custody for more than three years. Regarding prejudice, the State repeated the argument that vague assertions of missing witnesses do not meet the defendant's burden.

¶27.    The trial court denied Moffett's motion to dismiss after completing an extensive on-the-record analysis of the entire time period, addressing Moffett's speedy-trial and due-process claims.  Regarding the first incarceration, the Court found that the State had made the required showings, particularly as to the reason for the delay, the lack of an assertion of the right, and the absence of any prejudice to Moffett.  For the 1995-2002 period, the court

14

found that Moffett had shown neither actual prejudice nor intentional device by the State. Regarding the second incarceration, the court found that none of the four ***Barker*** factors favored Moffett.

¶28. On the motion to enforce the State's assertion that it would not seek the death penalty, the defense argued that it had relied to its detriment on the State's assertion and had not prepared for a sentencing phase. The State argued that it had additional evidence not available to it at the time of the December 2004 docket call. Specifically, this included DNA test results and photographs that only recently had been developed by using still frames from the crime-scene video, for the original photographs had been lost. The district attorney testified at this hearing that, after seeing the photographs, and considering the DNA evidence, she and her assistant had decided to seek the death penalty. The trial court denied the motion to enforce the assertion, but continued the trial from its August 2005 setting to allow the defense ample time to prepare for a sentencing phase. The parties agreed to a trial date of February 6, 2006.

¶29. Except as noted, the parties' arguments to this Court are the same as those presented to the trial court. Specifically, Moffett has now added the following arguments: (1) the unavailability of Powell due to her death caused prejudice such that a fair trial was impossible; (2) the unavailability of Powell's testimony, coupled with erroneous rulings at trial, had resulted in an unfair trial; and (3) the State's legally incorrect, "blatant," and "tactical" rationale for its decision to seek the death penalty provided evidence of the State's intentional device to gain tactical advantage.

15

¶30. No speedy-trial rights under the Sixth Amendment are applicable to the period after Moffett was released following the 1995 no-bill until after he was indicted in 2002. In *United States v. MacDonald*, 456 U.S. 1, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982), the U.S. Supreme Court dealt with a similar scenario. McDonald had been formally charged by military officials with a murder committed while he was an army officer. *Id.* at 5. However, the military charges later were dismissed, and MacDonald was discharged from the army. *Id.* More than four years later, a federal grand jury indicted MacDonald for murder. *Id.* at 6. MacDonald argued that the delay in indictment had violated his right to a speedy trial. *Id.* at 5. The *MacDonald* Court held that "[t]he Speedy Trial Clause of the Sixth Amendment does not apply to the period before a defendant is indicted, arrested, or otherwise officially accused." *Id.* at 6 (citing *U.S. v. Marion*, 404 U.S. 307, 313, 92 S. Ct. 455, 459, 30 L. Ed. 2d 468 (1971)). The Court continued as follows:

> In addition to the period after indictment, the period between arrest and indictment must be considered in evaluating a Speedy Trial Clause claim. *Dillingham v. United States*, 423 U.S. 64, 96 S. Ct. 303, 46 L. Ed. 2d 20 (1975). Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, see *United States v. Lovasco*, 431 U.S. 783, 788-789, 97 S. Ct. 2044, 2047-48, 52 L. Ed. 2d 752 (1977), or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending. Similarly, the *Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed,* like any delay before charges are filed, *must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.*

*MacDonald*, 456 U.S. at 7 (emphasis added). The Court went on to identify the interests served by the Speedy Trial Clause as follows:

> The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is

16

protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges. Once charges are dismissed, the speedy trial guarantee is no longer applicable. At that point, the formerly accused is, at most, in the same position as any other subject of a criminal investigation.

*Id.* at 8-9. Moffett's argument here is the same one rejected by the *MacDonald* Court. *See id.* at 9. Once he was released, Moffett, like MacDonald, "was not under arrest, not in custody, and not subject to any 'criminal prosecution.'" *Id.* at 10. Moffett, like "MacDonald[,] was legally and constitutionally in the same posture as though no charges had been made. He was free to go about his affairs . . . and to continue with his life." *Id.* As Moffett conceded in an argument on another issue, he "was living as a free man."

¶31. Moffett cites *Doggett v. United States*, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992), for the proposition that speedy-trial rights may apply to a person not in custody. In *Doggett*, the U.S. Supreme Court held that a lag of more than eight years between indictment and arrest triggers a speedy-trial inquiry. *Id.* at 652. The distinction is that Doggett had been indicted, while Moffett was released without being indicted. *See also U.S. v. Molina-Solorio*, 577 F.3d 300, 305 (5th Cir. 2009) (ten-year delay between indictment and arrest weighed in defendant's favor).

¶32. This Court has held that a defendant's constitutional speedy-trial right attaches at indictment or arrest, whichever is earlier. *See Handley v. State*, 574 So. 2d 671, 674 (Miss. 1990). "In short, the constitutional right to a speedy trial attaches when a person has been accused." *Smith v. State*, 550 So. 2d 406, 408 (Miss. 1989). Thus, the trial court correctly

held that Moffett's Sixth-Amendment right attached upon his arrest, and that it detached upon the no-bill. Moffett argues that the trial court erred, as a no-bill is not a formal dropping of charges comparable to the grant of *nolle prosequi* in **De la Beckwith**, 707 So. 2d at 565-66. However, the no-bill and release served the same purpose and had a similar effect. To bring Moffett back before a grand jury, the process would have had to be restarted. As **MacDonald** shows, a Fifth-Amendment due-process analysis may be required for those periods in which Moffett was not in custody and not under formal accusation. *See* **MacDonald**, 456 U.S. at 7-8.

¶33. However, the trial court should not have applied the speedy-trial statute to the first incarceration. *See* Miss. Code Ann. § 99-17-1 (Rev. 2007). The statute is inapplicable. Moffett had been neither arraigned nor indicted. Thus, the proper analysis would have been a constitutional speedy-trial analysis.

¶34. The **Barker** Court held that the length of the delay is a "triggering mechanism" for a **Barker** analysis. **Barker**, 407 U.S. at 530. However, "because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." *Id.* at 530-31. This Court in **Smith** held that an eight-month delay is presumptively prejudicial. *See* **Smith**, 550 So. 2d at 408. This Court has found delays of 298 and 288 days to be presumptively prejudicial, and a delay of six months not presumptively prejudicial. *See* **State v. Ferguson**, 576 So. 2d 1252, 1253-54 (Miss. 1991) (finding **Barker** factor one to be "a function of mathematics and the calendar"); **Handley**, 574 So. 2d at 677; **Bailey v. State**, 463 So. 2d 1059, 1063 (Miss. 1985). Thus, a delay of 250 days is presumptively prejudicial, and requires a full **Barker** analysis.

18

¶35.    Assuming it was proper to analyze the second incarceration to the exclusion of the first, the State was incorrect to argue that, if only a portion (less than 270 days) of a longer delay could be attributed to the State, the delay was not presumptively prejudicial, thus obviating the requirement of a full *Barker* analysis.  The entire delay from the date of indictment (which was the same day as his arrest) to the day of the expected trial should be considered in *Barker* factor one (length).  If that total is found to be presumptively prejudicial, the other factors should be analyzed.  Thus, the reasons for delay (continuances, changes in counsel, *pro se* motions) should be considered as a part of *Barker* factor two (reason).

*Speedy-Trial Analysis*

¶36.    *Barker* requires a balancing test with no factor considered essential or dispositive. However, the assertion of the right is given "strong evidentiary weight in determining whether the defendant is being deprived of the right."  *Barker*, 407 U.S. at 530-31.

¶37.    Moffett was arrested on December 31, 1994, and was in custody until September 7, 1995, a period of 250 days.  He was indicted and rearrested on April 9, 2002, and was held in custody until his trial began on February 13, 2006, a period of 1,406 days.  The two incarcerations totaled 1,656 days.  Thus, a presumption of prejudice arises, triggering an analysis of the other three factors (reason, assertion, and prejudice).  *Id.*

¶38.    The reasons for the delay(s) must then be considered.  The State argued that the first delay was due to the volume of physical evidence requiring laboratory analysis.  *Barker* instructs that this factor should take into account the "peculiar circumstances of the case," allowing for a longer delay the more complex the case.  *Id.* at 530-31.  We find that the State

19

met its burden on this reason for delay. Other delays were for various reasons, changes of defense counsel, continuances agreed to by both parties or continuances required of them by the court's docket. *Barker* instructs that a "neutral reason such as . . . overcrowded courts should be weighted less heavily" than a deliberate delay by the government. *Id.* at 530. Regarding delays caused entirely, or in part, by a defendant, such as continuances and changes in defense counsel, this Court has found that a "defendant may not later complain of any delay caused by him." *Jenkins v. State*, 607 So. 2d 1137, 1139 (Miss. 1992). We find that this factor weighs in favor of the State.

¶39.    Likewise, the assertion factor weighs in favor of the State. Moffett never asserted the right to a speedy trial during his first incarceration. Moffett did not assert a right during his second incarceration until his motion to dismiss, which was filed more than three years after he had been in custody. This Court has held that the filing of a motion to dismiss does not equate to an assertion of the right to a speedy trial. *See Scott v. State*, 8 So. 3d 855, 863 (Miss. 2008); *Guice v. State*, 952 So. 2d 129, 141 (Miss. 2007) (citing *Perry v. State*, 637 So. 2d 871, 875 (Miss. 1994)). Moffett concedes that this factor is not in his favor, but argues that it is outweighed by the other factors.

¶40.    As for the final factor, prejudice, *Barker* instructs, "If witnesses die or disappear during a delay, the prejudice is obvious." *Barker*, 407 U.S. at 532. Here, Moffett's mother died during the time Moffett was a free man. Thus, she was unavailable to testify at trial. Such prejudice could result in denial of a defendant's speedy-trial rights. *See Jenkins*, 607 So. 2d at 1140 (the only person who could testify to a certain fact had died); *Bailey*, 463 So. 2d at 1063 (two named witnesses could not be located at the time of trial). These cases are

20

distinguishable, for Moffett's claim of absence of alibi witnesses[7] is without support, and Powell was not the only person who could testify that Powell entered the house without a key. Moffett produced no names of any missing alibi witnesses, only a vague assertion that his former lawyer had investigated an alibi defense, but had lost the file. *See **Killen v. State***, 958 So. 2d 172, 190 (Miss. 2007); ***De la Beckwith***, 707 So. 2d at 570 ("Vague assertions of lost witnesses" are insufficient).[8]

¶41.  Moffett asserts that the loss of Powell as a witness prejudiced his defense. That assertion was not timely raised in his motion to dismiss before the trial court.[9] "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." ***Mills v. Nichols***, 467 So. 2d 924, 931 (Miss. 1985). If the procedural bar were not in place, the result would not differ, for Moffett was able to offer evidence through the testimony of his sister, Sheritha, that her mother (Powell) had entered Pennie's house without a key on the night of the murder, to establish entry without a key, thus distinguishing ***Jenkins***. Assuming arguendo that had Powell's absence been presented to the trial court as proof, the prejudice factor would lean only slightly in Moffett's direction, given the dubitable value of such testimony; it was an established fact that both the front and burglar doors could be opened from the inside by the girls without a key.

---

[7]In a custodial statement given in 1994, Moffett claimed he was at a bar until 4:30 a.m., came home, and found Felicia. The State was prepared to rebut this alibi with Thomas Phillips, *see infra*, Issue V.

[8]These are due-process analyses, but the comparison is still apt.

[9]Defendant renewed his motion to dismiss for a speedy-trial violation/mistrial based on a missing witness (Powell) after the State rested and during the testimony of the first defense witness on February 24, 2006. The trial court overruled the motion.

¶42. We find, upon weighing all factors, that Moffett's Sixth-Amendment right to a speedy trial was not violated. *Barker* addressed a five-year delay between indictment and trial, with the delays mostly due to continuances sought by the government. *See Barker*, 407 U.S. at 533-34. However, the Court found that the most important factor was the lack of an assertion. *Id.* at 534 ("Barker did not want a speedy trial. . . . [N]o action whatever [was] taken between October 21, 1958, and February 12, 1962, that could be construed as the assertion of the speedy trial right."). Moffett's inaction is no different. Moffett never timely asserted his right to a speedy trial. As we find that the trial court reached the correct result by a different analysis, we find no error. *See Green v. Cleary Water, Sewer & Fire Dist.*, 17 So. 3d 559, 572 (Miss. 2009).

*Due-Process Analysis*

¶43. The burden of persuasion rests with the defendant. *See Killen*, 958 So. 2d at 189; *De la Beckwith*, 707 So. 2d at 569 (citing *Hooker v. State*, 516 So. 2d 1349, 1351 (Miss. 1987)). The defendant must show actual prejudice **and** that the delay was an intentional device of the government to obtain tactical advantage over a defendant. *See De la Beckwith*, 707 So. 2d at 569 (citing *Marion*, 404 U.S. at 465). *See also Lovasco*, 431 U.S. at 795.

¶44. The prejudice element is discussed *supra* in the speedy-trial analysis. We find that Moffett failed to meet his burden of showing actual prejudice. Even if we were to indulge in an assumption of prejudice, Moffett failed to show intentional device on the part of the State in delaying the trial. After the no-bill, the State did not pursue the case until after it was reopened by a cold-case unit in 2002. Moffett offers no evidentiary support that the State

22

"waited in the weeds" until Powell passed away.[10] Moffett failed to show the indictment was sought at a time to gain tactical advantage. Thus, we find that neither Moffett's Sixth-Amendment right to a speedy trial, nor his due-process right to a speedy trial was violated. The record reflects that a fundamentally fair and impartial trial occurred despite the delays. Thus, we affirm the trial court's declination to order dismissal, the sole remedy available upon a finding that delays made a fair trial impossible. *See **Bailey***, 463 So. 2d at 1064 (citing ***Strunk v. U.S.***, 412 U.S. 434, 93 S. Ct. 2260, 37 L. Ed. 2d 56 (1973)).

> **III.**           **The trial court erred in limiting the defense in the topics it could cover in voir dire.**

¶45. This Court has stated the following:

> The standard of review in examining the conduct of voir dire is abuse of discretion. Abuse of discretion will only be found where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint of the defense.

***Jackson v. State***, 791 So. 2d 830, 835-36 (Miss. 2001) (citations omitted.)

¶46. Moffett argues that he sought in a pretrial motion "to explore [as a part of individual voir dire] potential jurors' views on drug and alcohol use. The request was based specifically on the potential evidence of Moffett's use of drugs or alcohol being introduced in this case." Moffett argues that he "was not only limited in his ability to offer mitigation at sentencing, he was prejudiced when the prosecution injected the issue . . . during the guilt phase after successfully precluding the defense from questioning on this topic."

¶47. At a motion hearing, Moffett asserted that evidence regarding his drinking might be heard by the jury through (1) Pennie's testimony, as she had stated to the police that Moffett

---

[10]Powell declined to meet with police while she was alive.

went to a bar on the night of the murder; or (2) the police officers' testimony, as they had reported that they could smell alcohol on his breath at the time of the arrest. The State countered that alcohol use was irrelevant to the trial, unless Moffett chose to (1) use an alibi defense that he was at a bar, or (2) present evidence of intoxication as a mitigator in the sentencing phase. *See **Bell v. State***, 360 So. 2d 1206, 1212 (Miss. 1978). The State asserted that it would not put on testimony related to alcohol use. The trial court denied Moffett's motion, stating that it did "not see the relevance at [that] time of inquiries into drug use or individual alcohol use." At trial, Moffett did not use an alibi defense, nor did he present intoxication as a mitigator.

¶48.    Moffett complains of testimony given during the State's redirect examination of a police officer regarding Moffett's demeanor before his arrest:

State:          Officer Davis, [the defense attorney] tried to suggest to you that the suspect or subject was merely upset. How would you describe his demeanor that night? How would you describe his demeanor, the male at the scene?

Witness:      He was just irate. He wasn't upset.

State:          Was he crying?

Witness:      No, he wasn't.

State:          Did you see any tears?

Witness:      No, I didn't.

State:          So it wasn't that. He wasn't merely upset.

Witness:      No, sir. He wasn't emotionally upset. He was – appeared to be – had alcohol on his breath if I can recall. And he didn't appear to be emotionally upset at all.

24

This innocuous comment was not induced by or responsive to a question about alcohol. The State did not ask the witness a question about alcohol or drugs. Moffett cites a Mississippi Court of Appeals case in arguing that, when a police officer offers inadmissible testimony, the State is charged with the impropriety. *See Campbell v. State*, 750 So. 2d 1280, 1283-84 (Miss. Ct. App. 1999). However, in *Campbell*, "improper testimony of a separate pending criminal charge was repeatedly elicited from several witnesses throughout the course of the trial . . . ." *Id.* at 1281. Here, the witness mentioned alcohol. The defense did not object at the time of the testimony. The only other mention of alcohol came during the defense's cross-examination of Pennie Griffin. The defense attorney asked, "When Eric left the house you thought he was going off to drink?" The court sustained the State's objection, in which the State alleged that the defense was attempting to "back door an alibi."

¶49.   Moffett cites numerous cases in arguing that a defendant has a constitutional right to ask potential jurors about a mitigation issue. *See Smith v. Texas*, 550 U.S. 297, 315-16, 127 S. Ct. 1686, 1698, 167 L. Ed. 2d 632 (2007); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007); *Tennard v. Dretke*, 542 U.S. 274, 285, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004); *Penry v. Johnson*, 532 U.S. 782, 797, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). However, in each of those cases, unlike here, the defendant actually presented potentially mitigating evidence, such as mental retardation, abuse during childhood, learning disability, depression, or lack of impulse control. *See Smith*, 550 U.S. at 313; *Abdul-Kabir*, 550 U.S. at 239-40; *Tennard*, 542 U.S. at 277; *Penry*, 532 U.S. at 796-98. Each case is distinguishable.

¶50.   The United States Supreme Court has stated the following regarding voir dire:

[A] suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.

*Mu'Min v. Virginia*, 500 U.S. 415, 422, 111 S. Ct. 1899, 1903-04, 114 L. Ed. 2d 493 (1991).

*See also Aldridge v. U.S.*, 283 U.S. 308, 310, 51 S. Ct. 470, 471, 75 L. Ed. 1054 (1931).

¶51.   We find no abuse of discretion by the trial court, for its ruling caused no undue constraint on the defense.

      **IV.**      **The trial court erred in removing for cause jurors even though they were qualified to serve under <u>Witherspoon</u>.**

¶52.   Moffett argues that it was reversible error for the trial court to excuse prospective jurors Grice, Hardwick, and Bunch, as they were qualified to serve under the rule from *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), as follows:

[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

*Id.* at 522.  Also, Moffett cites *Fuselier v. State*, 468 So. 2d 45 (Miss. 1985), which held that a juror's opinion on the death penalty is not a proper ground for granting a challenge, "[a]bsent a clear showing that the prospective juror would be unable to follow the court's instructions and obey the juror's oath . . . ." *Id.* at 55.

¶53.   The trial court held two days of general voir dire, followed by four days of individual voir dire.  More than one hundred jurors were questioned privately, regarding, *inter alia*, their opinion on the death penalty and what effect that opinion might have.  Each juror had

26

completed a questionnaire, including the following multiple-choice question, "What do you think of the death penalty?" The answer choices were "Strongly Favor," "Generally Favor," "No Opinion," "Generally Opposed," and "Strongly Opposed." The question was followed by several lines on which the juror could explain further. During individual voir dire, the court asked each juror the following question (or one very much like it), "Would your views on the death penalty prevent or substantially impair the performance of your duties in accordance with the jury instructions and your oath?" After being questioned by the court and both parties, each juror was asked to wait outside the courtroom while a decision was made on excusing the juror for cause.

*Prospective Juror Grice*

¶54.   Grice circled "No Opinion" on her questionnaire and wrote "n/a" on the lines below the question. She was asked to explain. Her responses included the following: (1)"I just did not want to come to that point." (2) "I just did not want to make a decision. And that's the reason I put no opinion." (3) "I just did not want to make a decision if – you know for corporal (sic) punishment." When asked if not having an opinion would substantially impair the performance of her duties in accordance with the instructions and oath, she replied, "Not to a certain extent. But I just do not want to make a decision on that." When asked, "Would you follow the Court's instructions and render a fair verdict according to the law, the evidence and your oath," she responded, "Yes, sir." During questioning by the State, she said she did not oppose the death penalty and could impose it if warranted, but continued, "I just don't want it to come to that." The State asked, and then repeated, the following question, "[W]ould it put you in a position that you could not fairly consider the death penalty or life

27

without parole because you do have very strong feelings about not wanting to make a decision?" Her response both times was, "Correct." When given a chance to explain her answers, she stated:

> I understand what you're saying, but it's just putting a thought in my mind. I have been thinking about it and I just don't want to go. You know, it's hard to explain, but I just did not want to – I don't mind being a juror, but when it comes to corporal (sic) punishment, me personally, I just did not want to go and serve in that matter.

However, in response to a question by the defense, she stated she could reach a decision on life without parole or the death penalty. When the State asked her to explain, the following exchange occurred:

> Juror: I can do what the judge – his agreement, I mean, you know, about the statements. And I can understand and follow what he tells us. And I could make a decision along with the other jurors. I can do that.

> State: So you're saying now that you could fairly consider both the death penalty and life without parole?

> Juror: Yes.

¶55. The court granted the State's challenge for cause, stating that Grice had been consistent in regard to the death penalty in that she had no opinion, but had been inconsistent in all other ways. The court noted that she had given opposite responses to similar questions posed by the State and defense, and that she was hesitant and vague. The court summed it up by saying that Grice had failed to "convinc[e] the Court that she could really willingly give a verdict on the death penalty or life without parole, or if she did it would be a forced type of situation . . . ." The court then overruled the defense objection, stating that the

28

decision had been made taking into account the witness's demeanor, as well as her answers.

*Prospective Juror Hardwick*

¶56.    Hardwick circled "Generally Favor" and wrote that the death penalty "can be used to protect society from people who commit horrible crimes."  When asked by the court to elaborate, she stated, "The death penalty is something I do agree with.  I don't have anything against it, but whether or not I would be able to impose it on somebody I'm not sure.  I can't say that.  I don't know." When asked if she could render a verdict of life without parole, she said she could.  But if death were the appropriate sentence, she said she could not be sure. The court asked if, according to the evidence, the law, and the juror's oath, she believed a death penalty was justified, could she vote for a death penalty.  She responded that she did not know for certain.  After it appeared that the juror did not understand that she was being asked a hypothetical question, the State asked the question again in painstaking detail. The juror again responded that she did not know.  However, when the defense asked if she could consider both sentences, she responded, "I could consider both."  She reversed herself again when the prosecutor repeated the question of whether she could vote for death if she were convinced that death was the appropriate sentence.  She was still unsure if she could vote for death.

¶57.    The Court granted the State's challenge, stating the following:

> The court asked her if the evidence and the law and her oath justified voting for the death penalty could she fairly vote for it based on those, asked her that maybe at least once, if not twice.  And she said that she couldn't say for sure whether she would, maybe but she just couldn't say.
> And she was asked many, many times . . . if she would be willing to vote for the death penalty if the evidence and the law justified it.  And again, all she could say was . . . I would consider it.  Maybe I will, maybe I won't.

29

The Court doesn't believe that that meets the standard required. She never expressed any willingness to carry forward any consideration. And she was given every opportunity to do so and she didn't.

*Prospective Juror Bunch*

¶58. Juror Bunch circled "Generally Oppose" and wrote "Seems barbaric; however I would not be [opposed] to victim's families making that decision." When asked to elaborate, the following exchange occurred:

> Juror: The more that I've thought about this and also sat in this courtroom, I think that I could possibly hand down a –
>
> Court: Death penalty?
>
> Juror: Death Penalty. Let's just say this. I would hope that I could be open minded. In general I've always thought its kind of an acrognostic (sic) kind of thing to kill somebody in the way we kill them. I've always thought that I would have to have some kind of a . . . personal experience, either with a family member being murdered or maybe sitting on a jury like this to really, really know if I could hand down a death penalty.

When asked if she were convinced that the death penalty was the appropriate sentence, could she vote in favor, the following exchange occurred:

> Juror: I think I can be open-minded about it. This is so hard because up until two weeks ago I've always said that I probably would not be able to vote for a death penalty. But I'm rethinking that now and I think there is a possibility that I could. But you want a yes or no; right?
>
> Court: Well, we really need something more definite than a possibility. And, you know, just, of course, be honest and just state what your views are. No one is trying to pressure you or make any suggestions to you or anything like that. It's just your decision.
>
> Juror: Yes. I think I – yes.

When asked, if she were convinced that life without parole was the appropriate sentence, would she be able to vote for it, she replied, "Yes." The Court then asked, "So based upon your answer, you would have no problem at all with the life without parole, but you seem to have some wavering about the death penalty." She responded, "That's correct."

¶59. Bunch maintained that, despite her life-long opposition, she was "rethinking" her views on the death penalty. However, she agreed with the State that she "still lean[s] toward generally opposed." She continued, "[H]owever, I would hope that after hearing all of the evidence and understanding all of the evidence that I could be open-minded about the decision and not allow, you know, my past – not be stuck in the past of generally opposed." When asked how much aggravating evidence would be required, the following exchange occurred:

> State: Wouldn't you agree with me that it would take a mountain of evidence of aggravating circumstances . . . to get you to get past life without parole and to the death penalty.
>
> Juror: I think you've said it exactly the way I feel.
>
> State: So we're looking at Mount Everest, the Himalayas, a mountain full of evidence; correct?
>
> Juror:  A hundred percent of my mind.
>
> . . .
>
> State: [I]t's going to take even more than the reasonable doubt to put him to death?
>
> Juror: Yes, sir.

During the questioning by the defense, she stated, "[P]rior to these two weeks I've been somewhat uncomfortable with the State . . . who gives the state authority to put someone to

31

death. . . . And it does seem to be a bit like . . . wild west or something like that." When asked by the defense if she could vote for the death penalty if she believed the State's evidence warranted it, she replied, "Yes, but I guess what I'm saying is I want people to know that that's sort of odd for me from where my point of view has been up until this." The following colloquy occurred when she was asked her current views:

> State: [I]n your mind do you still have a question whether or not the State has the authority to put someone to death, or who gives us that authority.
>
> Juror: Yes, sir. And it's right up there with those questions like what will happen to us after our death.
>
> State: So it's a pretty big question?
>
> Juror: It's a big question.
>
> State: And it goes not only – and a question like what happens to us after our death, that goes to faith and values; correct?
>
> Juror: Yes, sir.

The Court granted the State's challenge for cause, noting that Bunch had struggled with her answers regarding the death penalty, and that she had said the death penalty was barbaric and had questioned whether the State has the authority to carry it out. Taking this into account as well as her demeanor, the court opined that "her views on the death penalty would substantially impair her performance of her duties in accordance with these jury instructions and her oath." The court continued as follows:

> It takes more than somebody mouthing that . . . it would not affect their performance. Somebody could say I'm flatly opposed . . . under any circumstances, but then answer a question about whether their views would prevent or substantially impair the performance . . . and that obviously in the opinion of this judge would not be adequate.

32

¶60.   Absent an abuse of discretion, this Court grants deference to the decisions of a trial court regarding for-cause excuse from jury service.  *See King v. State*, 960 So. 2d 413, 435-36 (Miss. 2007); *Spicer v. State*, 921 So. 2d 292, 322 (Miss. 2006).  *See also Wainwright v. Witt*, 469 U.S. 412, 426, 105 S. Ct. 844, 853, 83 L. Ed. 2d 841 (1985) ("deference must be paid to the trial judge who sees and hears the juror").

¶61.   *Witherspoon* and its progeny set our standard as follows:

> This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526, 65 L. Ed. 2d 581 (1980).  *Witt* reaffirmed *Adams* and clarified *Witherspoon* as follows:

> [T]his standard . . . does not require that a juror's bias be proved with "unmistakable clarity."  This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.  What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Witt*, 469 U.S. at 424-26.

¶62.   This Court has affirmed the decisions of trial judges who excluded jurors who "repeatedly switched positions," "gave wavering responses," or "exhibited an obvious confusion concerning the issue." *King v. State*, 960 So. 2d 413, 435 (Miss. 2007); *King v.*

33

*State*, 784 So. 2d 884, 888 (Miss. 2001). "It goes without saying that a potential juror who cannot give a straight answer would be very unlikely to follow the law." *King*, 784 So. 2d at 888. In *Spicer*, this Court stated, "'A juror's position on the death penalty must be unmistakably clear, or a trial judge may properly remove [the juror] for cause in a capital case.'" *Spicer*, 921 So. 2d at 322 (quoting *Brown v. State,* 890 So. 2d 901, 910 (Miss. 2004)).

¶63.    None of these three prospective jurors provided an unmistakably clear and consistent answer regarding whether their views on the death penalty would prevent or substantially impair the performance of their duties in accordance with the jury instructions and oath.

¶64.    Grice's answers varied according to the questioner. The only thing certain was her unwillingness to make a decision on the death penalty. When she was given an opportunity to speak freely, she made a statement that can be read as her unwillingness to follow the court's instructions and her oath as a juror. The trial judge, who saw and heard her, was not convinced that Grice could render a sentencing-phase verdict.

¶65.    Hardwick was asked repeatedly whether she could vote for the death penalty, if she was convinced in accordance with the evidence, the law, and her oath as a juror, that the death penalty was the appropriate sentence. But she never said she could do so, even if properly convinced. The most she could say was that she would consider it. The defense cites *Fuselier*, arguing that the trial court had misconstrued *Witherspoon* by requiring Hardwick to commit affirmatively in advance of trial to vote for death. *Fuselier*, 468 So. 2d at 55. In *Fuselier*, jurors stated, in reaction to the defense's opening statement, that they could not vote for the death if some of the evidence was missing. *Id.* at 54. The *Fuselier*

jurors were never asked a hypothetical, but were excused for cause without further questioning. This Court held it error to have excluded them under those circumstances. *Id.* Here, unlike in *Fuselier*, Hardwick was not excused for declining to commit in advance to vote for the death sentence in this case. She was asked, in a hypothetical fashion, whether she could do so if she were convinced it was proper.

¶66. Bunch's responses at voir dire conflicted with her responses on her questionnaire. Near the end of voir dire, after having stated that her views had changed because of her experience as a member of the venire, she reaffirmed her prior positions, questioning the authority of the state to carry out the death penalty. *See Witt*, 469 U.S. at 423 ("Exclusion of jurors opposed to capital punishment began with a recognition that certain of those jurors might frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths."). The trial court took these answers, as well as her hesitation and overall demeanor, into account in finding that she would be prevented or substantially impaired in performing her duties as a juror.

¶67. Thus, we find, in deference to the trial judge who saw and heard the jurors, that he did not abuse his discretion in excusing these three jurors for cause.

> **V.** **The trial court violated Moffett's state and federal constitutional right to present a defense when it prohibited evidence of "Third-Party Guilt" thereby depriving Moffett of a fundamentally fair trial.**

¶68. No evidence was presented that the subject of this issue, Moffett's stepfather, had been at the scene before the crime. Rod Eriksen, a JPD homicide detective, was asked by the defense, "During your investigation, based on a report from an officer who was on the

35

scene[,] you determined that there was a convicted sex offender associated with this family?" The State objected on the grounds of relevance and hearsay. The State's objection was sustained, as the court found the evidence to be irrelevant. The court allowed the defense to make a proffer. He testified that there was no evidence that Moffett's stepfather was at the scene at the time of the murder or at any time before Moffett called and asked his mother and stepfather to come to the house later that morning. Eriksen did not know how the other officer was familiar with the stepfather, whether it was by personal knowledge or something he had heard from others. After the proffer, the court ruled that the evidence was inadmissible, as it was (1) hearsay without an exception; (2) irrelevant; and (3) if relevant, its "probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury."[11]

¶69.   Moffett cites *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006). However, *Holmes* is not on point, as the issue there was "whether a criminal defendant's federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." *Id.* at 321. Here, the trial court analyzed the evidence independent of the strength of the State's case. Further, *Holmes* is factually distinguishable, as the third party in that case (1) was (according to several witnesses) in the neighborhood at the time of the crime; and (2) had (according to

---

[11]After the ruling, the prosecutor retrieved a file on the stepfather. It revealed that he had been indicted, but never convicted, as the case had been remanded to the files after the "complainant . . . and her mother" recanted.

four witnesses) confessed his own guilt and/or acknowledged that the defendant was innocent. *Id.* at 323. The *Holmes* Court held the following:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Id.* at 326-27.

¶70. Moffett's reliance on *Terry v. State*, 718 So. 2d 1115, 1123 (Miss. 1998), is similarly unhelpful to him. In *Terry*, this Court reversed an employee's conviction for embezzlement, holding that the trial court had erred in excluding evidence that the owner of the business had taken the money. *Id.* at 1118. Considering the evidence sought to be admitted (the owner held an insurance policy against losses from employee theft and possessed large sums of cash while the business was failing), this Court found that the evidence was relevant and that its probative value was not outweighed by other factors. *Id.* at 1118, 1122-23. This Court remanded the case with the following instruction: "[N]o evidence should be admitted without first traveling through the filter of Miss. R. Evid. 403." *Id.* at 1123.

¶71. Here, the trial court correctly applied the rules of evidence to the facts of the case. Accordingly, we find no abuse of discretion in excluding this evidence.

**VI.** **Eric Moffett was denied his right to testify in his own defense where the trial court ruled that the prosecution could present a rebuttal witness but Moffett would not be allowed to offer evidence that contradicted that witness with prior inconsistent statements and results of the police investigation.**

37

¶72. In a custodial statement not presented to the jury, Moffett stated on the morning of his arrest that he had been at a bar until 4:30 that morning and that, when he got home, Felicia had already been attacked. A Supplementary Offense Report included Thomas Phillips's name on the witness list. The report reveals that (1) Phillips was at the bar between 8:00 p.m. and 3:00 a.m. on the night of the murder; (2) Moffett, whom Phillips had identified from a photograph, was at the bar that night wearing a dark sweater; and (3) Moffett left the bar at approximately 1:30 a.m., but not later than 2:00 a.m.

¶73. Phillips was scheduled for heart surgery during the trial. Therefore, his videotaped testimony was taken before the trial judge the Friday before trial began on Monday. The prosecution intended to offer his testimony only if Moffett testified and asserted an alibi that he was at Phillips's bar at the time of the murder. Phillips testified that he was the owner of the bar, and that, on weekend nights (such as December 30, 1994), the disc jockey at the bar stopped playing at approximately 1:30 a.m. and that by 2:00 a.m., Phillips closed the bar. Phillips testified that he never let anyone stay in the bar after closing time. On cross, the State objected when the defense asked Phillips about a statement he gave police years earlier. The State argued that Phillips had been interviewed by police only in response to Moffett's custodial statement, which the State was not offering as evidence, as it was self-serving. The State charged that the defense was attempting to "back door" an alibi defense through Phillips. The defense countered that Phillips's testimony was being taken pretrial and that the only way his testimony would be put before a jury would be if Moffett testified, claiming the bar as an alibi. Thus, according to the defense, Moffett should not be denied an opportunity to cross-examine the witness and attempt to impeach his testimony. The court

decided to videotape Phillips testifying, with and without the objectionable evidence. One video was without Phillips's (and Moffett's) statements to police, and the other video would include questions about Phillips's and Moffett's statements to the police. In video one, on cross, Phillips conceded he did not recall specific facts about the night of the murder. On direct in video two, Phillips was unable to recall information in his statement to police. Even when shown a copy of the statement, his memory was not refreshed. On video two, during cross-examination, he could not recall what time he arrived at the bar that particular day (whether it was 8:00 p.m., as in the police report, or 1:00 p.m., which was his usual practice on weekends). On redirect on video two, he recalled having identified Moffett when a police officer showed him a photograph. He stated in both videos that his bar would not have been open until 4:00 a.m on December 31, 1994, but was closed by 1:30 to 2:00 a.m.

¶74. On Monday, February 13, 2006, the first day of voir dire, the State offered the cases it relied upon in its argument the previous Friday. After reviewing the cases, the trial court ruled that the first video would be admissible. The court cited several cases, including: *Simmons v. State*, 805 So. 2d 452 (Miss. 2001); *Wilson v. State*, 451 So. 2d 718 (Miss. 1984); and *Shorter v. State*, 257 So. 2d 236 (Miss. 1972). The State intended to offer Phillips's testimony in rebuttal, if Moffett testified and used the bar as his alibi.

¶75. At trial, near the end of the defense's case, the defense renewed its objection to the court's ruling regarding Phillips's testimony. The defense moved to have video one excluded, claiming the testimony was "unreliable." The trial court denied the motion. No attempt was made to offer either video one or video two by the defendant or the State. The defense rested without Moffett testifying.

39

¶76. Moffett had the right to testify in his defense, to call witnesses in his favor, to cross-examine witnesses called against him and to attempt to impeach their testimony. *See* U.S. Const. amend. VI; *Rock v. Arkansas*, 483 U.S. 44, 52, 107 S. Ct. 2704, 2709, 97 L. Ed. 2d 37 (1987); Miss. Const. art. 3, §26; *Dizon v. State*, 749 So. 2d 996 (Miss. 1999). *See also Culberson v. State*, 412 So. 2d 1184, 1186 (Miss. 1982). Likewise, he had a right not to testify. *See Brooks v. Tennessee*, 406 U.S. 605, 609, 92 S. Ct. 1891, 1893, 32 L. Ed. 2d 358 (1972).

¶77. The trial court was correct in finding that Phillips could not be examined on Moffett's self-serving custodial statement, absent the defendant testifying. This Court stated in *Simmons*: "[T]he defendant is barred from introducing a statement made by the defendant immediately after the crime, if it is self-serving, and if the State refuses to use any of it.'" *Simmons*, 805 So. 2d at 489 (quoting *Nicholson ex rel. Gollott v. State*, 672 So. 2d 744, 754 (Miss. 1996)). *See also Jones v. State*, 342 So. 2d 735, 736-37 (Miss. 1977); *Shorter*, 257 So. 2d at 240.

¶78. If Moffett had testified, as he had every right to do, and had claimed he was at the bar at the time of the murder, Phillips's testimony would have then been admissible and rightly subject to cross-examination and impeachment. However, Moffett exercised his right not to testify. Moffett cannot claim that his right to testify was denied. If he wanted to testify, he could have. If he had presented his alibi defense, then Phillips's testimony could have been presented to the jury. The appropriate video of his testimony would have depended upon Moffett's testimony and perhaps that of others. As Moffett chose not to testify, the issue is

moot, for neither version of Phillips's testimony was offered into evidence. We find that Moffett is entitled to no relief on this assignment of error.

> **VII.**        **The trial court erred in allowing the prosecution to elicit unreliable hearsay evidence in violation of Moffett's confrontation rights and his right to a fair trial.**

¶79. Moffett argues that the State elicited hearsay testimony from Pennie when she was recalled to the witness stand during the defense's case. She testified that Powell told her that she had come from a casino on the night Powell drove Pennie to work. According to Moffett, the State did this to attack the credibility of Sheritha's testimony that she had been in the car with Powell and had seen Powell enter Pennie's house without a key.

¶80. Earlier, when Pennie testified during the State's case, she said she went to the gas station with the intent to call her employer and say that she was not coming to work. However, when someone answered, she hung up without saying anything. She was then going to call Powell, but did not, because Powell had arrived at the gas station before she could do so. Powell told her she had stopped at Pennie's house. At no time during the State's case was Pennie asked, nor did she state, anything about a casino or where Powell had been before she arrived at Pennie's house.

¶81. Three days into testimony, Pennie was recalled by the defense. She testified that Sheritha was not with Powell when Powell took her to work. On cross, the State asked Pennie, "[W]here was [Powell] coming from when she came to pick you up?" When Pennie attempted to answer, Moffett objected, asserting hearsay. The Court sustained the objection. The State reframed the question, "Had she been to the casino?" Pennie responded, "That's

41

what she stated." The defense renewed its objection to hearsay, and the Court sustained once again. The next question asked by the State was, "Do you know what the legal age is to go to the casino?" She answered: "Twenty-one." Following this, a bench conference was held. The defense renewed its objection based on hearsay and relevance. The State argued that Pennie had testified about the casino in her prior appearance, and that the casino testimony had been admitted without objection,[12] thus, the hearsay objection was untimely. The trial court reversed its decision without verifying the record. The State then argued that the testimony was relevant, because:

> [Sheritha]'s going to testify what the mother did. And . . . . according to this witness she was not even in the car . . . . And the reason she wasn't in the car was she couldn't have been at the casino with the mother, which is where she had come from.

The trial court accepted this argument, as follows:

> If the [defense] is going to have evidence that the girl . . . was with her mother when she came to pick up [Pennie], . . . it's arguable that the State can make the point that it's unlikely . . . that the child was taken to the casino. . . . So I would overrule the objection and let them ask that question about the casino. So, I do think it's relevant.

The State then asked Pennie again if she knew the legal minimum age to enter a casino. She replied, "Twenty-one." She then repeated that Sheritha had been only twelve or thirteen at the time.

¶82. This Court has stated the applicable standard as follows:

> The admission or suppression of evidence is within the sound discretion of the trial judge and will not be reversed unless there is an abuse of that discretion. *See **Farris v. State**,* 764 So. 2d 411, 431 (Miss. 2000). We will only reverse

---

[12]The State now admits in its brief that it was mistaken in this contention, as there was no such question or answer during Pennie's earlier testimony.

under that standard if the admission of the evidence results in prejudice and harm to the opposing party, or if it adversely affects a substantial right of the party.

*Brown*, 890 So. 2d at 914.

¶83. The trial court was correct in the first place in sustaining the defense's hearsay objection; the testimony was inadmissible. *See* M.R.E. 801-804. Even if the testimony had been relevant, as the trial court found, that would have been immaterial to the hearsay question, as relevance is not a hearsay exception. *See* M.R.E. 803-804.

¶84. The State used this testimony to "attack[] the weight and worth of" Sheritha's testimony before Sheritha ever took the stand. *Lanier v. State*, 533 So. 2d 473, 488 (Miss. 1988). This was not impeachment of Sheritha's testimony; it was not done after Sheritha had offered allegedly false testimony. *See Balfour*, 598 So. 2d at 748-50; *Lanier*, 533 So. 2d at 488. As it is determined to be error, we must decide if the error contributed to the verdict.

¶85. The standard for harmless error is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Brown v. State*, 995 So. 2d 698, 704 (Miss. 2008) (quoting *Thomas v. State*, 711 So. 2d 867, 872 (Miss. 1998). Powell's whereabouts before she went to Pennie's house are irrelevant. The jurors might have thought any number of things, if they believed Sheritha, including the possibility that Powell went home to pick up Sheritha after going to a casino or took Sheritha with her. Of course, they may have rejected Sheritha's testimony entirely. Or they may have believed Powell's keyless entry was because one of the children simply opened the door for Moffett's mother. Moffett had a key, according to the testimony, but even his entry could have been accomplished through one of the children opening the doors from the inside. Whatever they

43

decided was ancillary to the overwhelming evidence of Moffett's guilt. Given the overwhelming evidence presented in support of conviction, we find beyond a reasonable doubt that the error did not contribute to the verdict obtained. Thus, the error is harmless.

> **VIII.** **The trial court erred in not allowing Moffett to introduce evidence that he was released from jail in 1995 without pending charges to rebut the false inference by the prosecution that his sister and mother were lying because they failed to come forward earlier to offer statements to the police.**

¶86. The State moved pretrial to prohibit any reference to Moffett's 1995 no-bill. The prosecutor stated that it was irrelevant that Moffett "didn't get into trouble for a period of time . . . ." The prosecutor concluded, "And we would ask that there be a motion in limine that all counsel have to abide by, and witnesses. . . . They cannot discuss that he was out of jail and had no problems during that period of time, or the fact that he was incarcerated in 2002 and has been held continuously." The court granted the motion, finding that the evidence was irrelevant, and even if it had been relevant, its probative value was substantially outweighed under Mississippi Rule of Evidence 403.

¶87. On direct questioning by the defense, Sheritha stated that she was twenty-three years old, but had been twelve at the time of the murder. She stated that Powell, her mother (also Moffett's mother), had died in 1999. Sheritha was asked several questions regarding the timing of events on December 30, 1994 (when she left her home, arrived at Pennie's house, observed her mother enter Pennie's house, and found Pennie at the gas station).

¶88. After Sheritha testified that her mother had entered Pennie's home, this colloquy occurred on cross, as the State was seeking to challenge Sheritha's credibility.

44

State:     Okay. And you've known about this information for – ever since this whole thing went down; correct?

Witness:   Ever since it's been going on.

State:     How many times have you told the police about this information?

Witness:   I never talked to the police.

State:     Never. So you're telling us that your brother is in trouble, charged with murder, and you never thought it was important to tell the police this information?

Witness:   No one ever asked me anything.

State:     No one ever asked you anything until Mr. DeGruy?

Witness:   Right.

State:     And –

Witness:   I never had to go to court or anything.

State:     Okay. So your brother is accused of committing a murder that occurred in 1994. He is in trouble. You guys never talked to any attorneys or anything?

Witness:   I never talked to anyone.

State:     Until Mr. DeGruy came along?

Witness:   Right.

State:     And told you about it?

Witness:   My mom was handling it before me. I didn't speak to anyone.

State:     So your mom did talk to the police?

Witness:   Yes, she did.

State:      Okay.  But do you ever know of her going – ever notice her going downtown to give a statement to the police?

Witness:    No, I don't know anything about that.

State:      You never paid any attention to that?

Witness:    I don't know if she – I don't know.  I can't answer that question.

*See* M.R.E. 104(e), 607. The defendant raised no objection, and thus waived the issue.  On redirect, Moffett's counsel asked Sheritha the date she told Moffett's attorney about having seen Powell enter Pennie's house.  The State timely objected, arguing that the question violated the motion in limine, *i.e.*, lacked relevance.  The defense never countered with a relevance argument, stating that the door had been opened by the State's questions.  The trial court sustained the State's objection, ruling that the door had not been opened by the State.

¶89.   Moffett argues that the State violated the ruling on the State's motion in limine by asking questions about Moffett having been "in trouble" and "charged with murder."  According to Moffett, the State used known false statements, "specifically phrased" to create an inference that Sheritha's testimony was a recent fabrication.

¶90.   The State asserted that the questions were "specifically phrased," and did not violate the ruling on the motion in limine.  *See Flowers v. State*, 773 So. 2d 309, 329 (Miss. 2000).  The State's motion in limine excluded any questions, eliciting of answers, or argument regarding whether Moffett was no-billed, living in the City of Jackson as a free man, not charged with any crime, out of jail, not in trouble, and having no problems during that period of time, or having been incarcerated since 2002.

46

¶91. The trial court cannot be held in error for enforcing its ruling on the motion in limine when the State timely objected. We will not hold a trial court "in error on appeal for a matter not presented to it for decision." Thus, we find no error. *See **Mills***, 467 So. 2d. at 931; Miss. R. Evid. 103(a)(1).

**IX.**        **The trial court erred in admitting exhibit 7, a highly prejudicial photograph with little or no evidentiary value.**

¶92. Moffett filed a pretrial motion to exclude all gruesome photographs, whether taken at autopsy or not, from the guilt phase of the trial. Alternatively, Moffett requested that, if the photographs were admitted, the State be required to use only black-and-white photographs. The trial court denied this motion.

¶93. Moffett assigns as error only the admission of Exhibit 7, a photograph taken at the emergency room of Felicia's perineal injuries. This photograph was admitted during the testimony of Dr. Magolia Castilla, the pediatrician who attempted to save Felicia's life at the emergency room at the University of Mississippi Medical Center. While the jurors viewed the photograph, Dr. Castilla described the injury as a "large vaginal tear" and said that it was "consistent with an intentional or non-accidental injury." Dr. Castilla explained that the nature of the injuries caused problems in completing a rape kit, as (1) the massive bleeding made sperm identification more difficult, and (2) it was difficult to take separate samples from the vagina and the anus because of the "area of continuity" between the two.

¶94. Moffett's expert witness, Dr. Lauridson, viewed the photograph during his testimony. He opined the vaginal injuries were not the cause of Felicia's death, but were consistent with an injury caused by a man's fingers or part of his hand. He confirmed that several

47

anatomical structures (vagina, vulva, perineum, anus, rectum) were torn completely through, making one opening. The State's expert witness, Dr. Steven Hayne, also used the photograph during his testimony.

¶95. Moffett argues that the photograph was admitted solely to inflame the jury, and that it caused him undue prejudice, which substantially outweighed its probative value. *See* M.R.E. 403. This Court has stated the following:

> [P]hotographs of a victim have evidentiary value when they aid in describing the circumstances of the killing . . . or supplement or clarify witness testimony. The admissibility of photographs rests within the sound discretion of the trial court. Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion. This standard is very difficult to meet. In fact, the "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value."

*Le v. State*, 913 So. 2d 913, 955-56 (Miss. 2006) (quoting *Brown*, 690 So. 2d 276, 289 (Miss. 1996)) (citations omitted). This Court has affirmed the admission of photographs of injuries to children. *See Jackson v. State*, 672 So. 2d 468, 485-86 (Miss. 1996) (photographs of the immediate areas around the stab wounds of four children).

¶96. Moffett's reliance on *Hickson v. State*, 472 So. 2d 379, 385 (Miss. 1985), and *McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989), is not persuasive, for this photograph pales in comparison to the jar of "pickled hands" and a photo of a "decomposed, maggot-infested skull." *Hickson*, 472 So. 2d at 385; *McNeal*, 551 So. 2d at 159. The photograph at issue aided in describing Felicia's injuries and supplemented the testimony of three witnesses, Drs. Castilla, Lauridson, and Hayne. We find no error in its admission.

## X.    The trial court failed to safeguard Moffett's right to a trial by a fair and impartial jury by not removing juror Loper.

¶97.    Moffett argues that the Court erred by failing to replace Juror Aubrey Loper, an uncle of Michael Recio, an arresting officer, after Recio's name was mentioned in the testimony of other policemen. Additionally, Moffett alleges prosecutorial misconduct in allowing the witnesses to mention Recio.

¶98.    During voir dire, Loper stated that Recio was his nephew. He knew that Recio was a policeman with JPD, but did not know how long he had been on the force. He "[h]ardly ever" saw Recio. Loper was asked, "Is the fact that your nephew is a long time member of the Jackson police force, and other officers from his agency would be testifying, would that be something on your mind at all?" He responded, "No."

¶99.    Following the questioning of Loper, Moffett brought to the court's attention that Recio was listed as a witness. The State countered that Recio would not testify, and that "He made no report. He . . . was one of the guys that . . . arrested [Moffett]." The defense responded, "Okay," and that, "under the circumstances it would be wise to stay away from mentioning Mr. Recio if [Loper] ends up on the case." When the twelve jurors (including Loper) and two alternates were selected, the defense did not exercise an available peremptory challenge as to Loper.

¶100.    At trial, three of the police officers who were at the scene on the morning of the murder testified. Each stated that Moffett was there and was angry, and that his behavior

49

escalated to the point that they had to put him in handcuffs.[13] Two officers stated that it took at least four male police officers to subdue and handcuff Moffett. Recio was mentioned as one of the officers involved in the arrest. When the officers' testimony was concluded, the defense moved that, because Recio's name had been mentioned, Loper should be removed from the panel and replaced by an alternate.

¶101. This Court has stated that a familial relationship of a juror to a witness, a crime victim, a policeman, or even a party "is not sufficient to require that a juror be excused for cause." *Bell v. State*, 879 So. 2d 423, 438 (Miss. 2004) (quoting *Bell v. State*, 725 So. 2d 836, 846 (Miss. 1998)). In *Gardner v. State*, 145 Miss. 215, 110 So. 589, 590 (1926), this Court stated, "The relationship of a juror to a witness, either by affinity or consanguinity, regardless of how close the relationship may be, does not disqualify such juror." In *Gardner*, a conviction for operating a still, the defendant sought to remove a juror for cause (and avoid using a peremptory challenge), as the juror was the father of a material witness, one of the deputy sheriffs who discovered the still. *Id.* This Court held it not error to deny removal of the juror for cause. *Id*.

¶102. Moffett argues further that the prosecutor committed misconduct by remaining silent when the defense raised its concerns about mentioning Recio, with the "apparent intent to seat Loper and then inject Recio." Moffett now argues that, even if the trial court had been correct that the defense's motion to remove Loper was untimely, this Court should find plain

---

[13]Sergeant Dorr testified, "Moffett was to the point where he was kicking furniture around . . . throwing chairs. He threw a 19-inch TV, and we wrestled him to the ground." Detective Hodge described Moffett as being "in a rage throwing furniture, and just in a rage making noises." Officer Davis stated that Moffett was "[o]ut of control. Not really upset but out of control."

error because the trial court allowed prosecutorial misconduct. *See Flowers*, 773 So. 2d at 326, 328-31; *Mickell v. State*, 735 So. 2d 1031, 1034-35 (Miss. 1999) (armed-robbery conviction reversed, prosecutor's questions presumed criminal conduct of witnesses); *Griffin v. State*, 557 So. 2d 542, 551-52 (Miss. 1990) (capital-murder conviction reversed, prosecutor commented on defendant's failure to testify); *Stringer v. State*, 500 So. 2d 928, 930-31 (Miss. 1986); *West v. State*, 485 So. 2d 681, 686-91 (Miss. 1985) (capital-murder conviction reversed for comments on failure to testify and additional prejudicial arguments). The mention of Recio's name by a witness was not error, plain or otherwise.

¶103.  We find no error in denying a for-cause challenge, either before or after Recio's name was mentioned.   If Moffett had valid concerns that seating Loper would be detrimental to his case, he had the opportunity to remove him via a peremptory challenge, but declined to do so.  We find no error on this issue.

**XI.**         **The trial court erred in denying proposed jury instructions D-11 and D-12.**

*Proposed Instruction D-11*

¶104.  As Donald Davis was a jailhouse informant, Moffett argues that it was error to deny the cautionary instruction he proposed:

> You must examine and weigh the testimony of someone who provides evidence against a defendant as an *informant, or for immunity* from punishment *or for personal advantage or vindication*, with greater care and caution than the testimony of ordinary witnesses.  You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case or by prejudice against the defendant, *or* by the *benefits* that the *witness has received* either financially or as a result of being *immunized from prosecution*.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.

51

You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

(Emphasis added.) The trial court stated, "D-11 instruction is not proper in this case under the circumstances, there being no favoritism or nothing preferential given to . . . Davis."

¶105. Davis testified that, at the time he first contacted the district attorney's office in September 1995, he intended to ask for something in return. At that time, Davis was under indictment for capital murder and five counts of armed robbery. In November 1998, more than three years later (and four years before Moffett was indicted), Davis pleaded guilty to murder and one count of armed robbery. The defense stipulated that the prosecutor who handled the plea agreement would testify that it was not offered in exchange for Davis's testimony in this case.[14] Davis was sentenced to life imprisonment with the possibility of parole after serving ten years. Davis testified that he sought assistance from the prosecutor's office when he was contacted later to testify in this case. He requested a favorable letter be sent to the parole board and for assistance in allowing him to serve his time in Hinds County, so he could be closer to his family. The request for a letter was denied.[15] After the trial was delayed, Davis was transferred by court order to the Central Mississippi Correction Facility ("CMCF") in Rankin County, as he needed to remain nearby.[16]

_____

[14]At a pretrial hearing on June 24, 2005, the lead prosecutor, Rebecca Mansell, advised the trial court that the Moffett investigation was moribund until 2002, when it was revived by the JPD Cold Case unit.

[15]Davis was moved to Hinds County, but the move was precipitated by court order, in order to testify in this case.

[16]Davis remained at CMCF until August 2010, when he was returned to Parchman. *See* http://www.mdoc.state.ms.us/InmateDetails.asp?PassedId=40048 (last viewed,

52

¶106. Moffett cites *Moore v. State*, 787 So. 2d 1282 (Miss. 2001), in which this Court reversed a capital-murder conviction because a trial court denied a similar instruction. *Id.* at 1292. However, *Moore* holds that "where informants do not receive favorable treatment in exchange for testifying, a trial court's refusal to grant an informant instruction is not necessarily error." *Id.* at 1286 (citing *Manning v. State*, 735 So. 2d 323, 335 (Miss. 1999); *Gray v. State*, 728 So. 2d 36, 72 (Miss. 1998)). The informant in *Moore*, who had been charged with aggravated assault, was released immediately after his testimony. *Moore*, 787 So. 2d at 1286. This Court held that the informant's release was "sufficient evidence of favorable treatment in exchange for his testimony to support the granting of the requested cautionary instruction." *Id.* In the case *sub judice*, no proof of favorable treatment was presented. In contrast, the evidence reveals that the prosecutor's plea proposal was not offered in exchange for Davis's testimony and that all requests for prosecutorial assistance were denied. We find no error by the trial court in refusing the instruction.

*Proposed Jury Instruction D-12*

¶107. Moffett argues that it was error to deny the following instruction:

> As a matter of law, an individual who has been convicted of a capital murder which occurred on June 25, 1995, shall be sentenced to death or to life without parole.
> As a matter of law, an individual who has been convicted of a murder which occurred on June 25, 1995, shall be convicted to life imprisonment. Such an individual, however, would be eligible for parole after serving ten years in prison.

Moffett argues that the instruction was necessary to advise the jury of the effect of Davis's plea bargain and that it was a correct statement of the law at the time of Davis's crime. The

September 4, 2010).

53

trial court found that the instruction was irrelevant and confusing, as "the jury might even confuse this with the current defendant as being what the sentence could be or would be." The jury heard in Davis's testimony that he was eligible for parole based on the sentence he received. The jury was further instructed in C-1 to "scrutinize all the testimony given" and to "give the testimony of each witness such credibility, if any, as you may think it deserves." D-12 is confusing, vague, and not a proper statement of law for Moffett's case. The trial court was correct that the instruction likely would confuse the jury. For these reasons, we find no error in refusing proposed instruction D-12.

> **XII.** **The prosecutor deliberately solicited opinions of the victims concerning the appropriate punishment for appellant in violation of the Sixth, Eighth, and Fourteenth amendments to the Federal Constitution, Article 3, Sections 14, 26, and 28 of the Mississippi Constitution, Miss. Code Ann. §§ 99-19-101 and 105, and other applicable law.**

¶108. Moffett filed pretrial a "Motion to Preclude Introduction of Victim-Impact Evidence." He argued, *inter alia*, that victim-impact testimony is permitted, but is subject to limits. *See Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609, 115 L. Ed. 2d 720 (1991); *Randall v. State*, 806 So. 2d 185, 218-20, 224-26 (Miss. 2001); *Berry v. State*, 703 So. 2d 269, 275-76 (Miss. 1997); *Hansen v. State*, 592 So. 2d 114, 146-47 (Miss. 1991). The State responded, "Victim Impact testimony is proper during the sentencing phase as long as it develops the case and is related to a statutory aggravator." *See Randall*, 806 So. 2d at 218.[17]

---

[17]This portion of *Randall* is unrelated to victim-impact evidence, as the issue was whether a prosecutor could introduce evidence of the defendant's gang tattoos during the sentencing phase. This Court found it error to admit the evidence, as it was irrelevant. The victim-impact issue in *Randall* involved the prosecutor's closing argument in which he referred to the victim in Randall's previous murder conviction. *See Randall*, 806 So. 2d at

54

¶109. At the sentencing phase, the victim's sister, LaQuandia, and mother, Pennie Griffin, offered victim-impact testimony. LaQuandia was asked, "Can you tell the jury what you feel would be the appropriate punishment for Eric?" Without an objection from Moffett, she responded as follows:

> My sister is not here. She's not sitting on that bench with her mom, her other sister, me and her family. She's not walking around having fun. She won't be able to go to the prom. She won't be able to come . . . with me anywhere. She can't go to the mall with me and my sister. She can't take trips with family. She can't do any of these things because she is not here. And if it was left up to me, death. He should not be here. She was only five. Only five.

On cross, the following exchange occurred:

Defense: Ms. Griffin, you know Eric's family too, don't you? Sisters and –

Witness: I know of them.

. . .

Defense: But you know that they love Eric very much?

Witness: Yes.

Defense: And I understand the pain you've been in for eleven years. Do you want to inflict that on them?

Witness: You still want the answer; am I correct?

Defense: You tell me. Yeah, sure.

Witness: Okay. I wouldn't want to inflict anything on anybody.

On redirect, she was asked, "Do you believe that Eric Moffett deserves and should receive the death penalty?" She replied, "Yes, I do."

---

218-20, 224-26.

¶110. Pennie was asked, "Can you tell this jury what you think would be the proper punishment of the defendant?" Her reply, once again without objection from Moffett, was as follows:

> I feel the same way . . . . I'm going to miss out on the prom. I'm going to miss out on the graduation. I have missed out on eleven Christmases. I have missed out on eleven Mother's Days. There's nothing nobody should have to miss out. And if I can't enjoy . . . that . . . , mine was taken away, and I feel like he shouldn't be here either.

Although Moffett made no contemporaneous objection, he now seeks refuge via the pretrial motion, arguing that the motion preserved this issue for appeal.

¶111. Moffett cites *Goff v. State*, 14 So. 3d 625 (Miss. 2009). In *Goff*, this Court held that a pretrial motion to suppress evidence retrieved from a vehicle had preserved the issue, despite the failure of the defendant to renew his objection at trial. *Id.* at 640. The *Goff* Court stated, "'While it would have been preferable, and by far the safer practice for [the defendant] to have renewed his objection, we find the error in this case was sufficiently preserved by language of the motion in limine, which the court overruled. . . .'" *Id.* at 748 (quoting *Kettle v. State*, 641 So. 2d 746, 748 (Miss. 1994)). However, *Goff* is distinguishable, for the trial court would have been required to rule on the same issue. Here, the pretrial issue was whether victim-impact statements ("VIS") should be prohibited as a matter of law, not whether a particular question is objectionable or the answer admissible. If all VIS were prohibited, all questions and answers would be inadmissible. However, since VIS are not prohibited, only questions and answers deemed by caselaw and the rules are inadmissible. We find *Goff* inapplicable. The only issue preserved for appeal is whether VIS in their entirety are prohibited. The answer to that question is clearly no.

56

¶112. Moffett now argues that *Payne* permits victim-impact evidence, but that there are limits, including a prohibition of asking family members for an opinion on the proper sentence. *See Payne*, 501 U.S. at 833; *Booth v. Maryland*, 482 U.S. 496, 508-09, 107 S. Ct. 2529, 2536, 96 L. Ed. 2d 440 (1987) (five-four decision) (*overruled in part by Payne*, 501 U.S. at 808). The *Payne* Court stated the following:

> [I]f the State chooses to permit the admission of victim impact evidence . . . the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.

*Payne*, 501 U.S. at 827. However, in holding that victim-impact testimony is not prohibited *per se*, the *Payne* Court specifically did not rule on some of the testimony at issue in this case, for no evidence was presented at the *Payne* trial regarding an appropriate sentence, a practice prohibited by *Booth*. *See id.* at 830 n.2; *Booth*, 482 U.S. at 508-09.

¶113. Our caselaw and statutes support the proposition that victim-impact evidence is permissible, but must be relevant to allow the jury to "know exactly who [the victim] was and what impact her death had." *Wilcher v. State*, 863 So. 2d 719, 758 (Miss. 2003). *See* Miss. Code Ann. §§ 99-19-151 to 99-19-161 (Rev. 2007). "[A] relative of the victim is usually in the best position to provide information to the court about the direct impact of the crime on . . . the victim's family." Miss. Code Ann. § 99-19-153(1)(d) (Rev. 2007). "With the permission of the trial court, the victim [or representative] may present an oral victim impact statement at any sentencing hearing." Miss. Code Ann. § 99-19-157(2)(a) (Rev. 2007). "Any victim impact statement submitted to the court under Section 99-19-157 shall be among the factors considered by the court in determining the sentence to be imposed upon

the defendant." Miss. Code Ann. § 99-19-159(2) (Rev. 2007). The VIS must not "serve in any way to incite the jury." *Berry*, 703 So. 2d at 275 (quoting *Jenkins*, 607 So. 2d at 1183). In *Wilcher*, and in other capital-murder cases in which victim-impact evidence has been allowed by this Court, the questions posed to the victims' relatives were limited to the personal characteristics of the victim and the impact of the victim's murder upon the family. *See Wilcher*, 863 So. 2d at 757. *See also Branch v. State*, 882 So. 2d 36, 68 (Miss. 2004); *Jenkins*, 607 So. 2d at 1183. Defense witnesses also are limited in their testimony. *Wilcher v. State*, 697 So. 2d 1087, 1104 (Miss. 1997) (not error to exclude testimony from defendant's family "that they wished for his life to be spared").

¶114. This Court has affirmed death sentences after victims' relatives were allowed to give opinions regarding sentencing. *See Wilson v. State*, 21 So. 3d 572 (Miss. 2009); *Havard v. State*, 928 So. 2d 771 (Miss. 2006). In both, as in the case *sub judice*, the defendant failed to object. In *Havard*, the defendant did not object to the victim-impact evidence, and this Court held that he had waived the issue on appeal. *Havard*, 928 So. 2d at 791-93. In *Wilson*, the defendant pleaded guilty to capital murder, waived a jury trial for sentencing, and did not object when the victim's grandfather testified at the bench trial that the defendant deserved the death penalty. *Wilson*, 21 So. 3d at 574-75, 589-90. The Court found that Wilson had waived the issue on appeal, but went on to discuss the merits of the issue, finding the following:

> It is highly unlikely that [the grandfather]'s statement, when read as a whole and taken in context with all the evidence before the sentencing judge, was the reason the judge imposed the death penalty. In fact, the trial judge's sentencing order, in which he makes findings of facts as to the various aggravating and mitigating factors, does not even mention [the grandfather]'s testimony.

58

*Id.* at 589-91. Moffett, like Havard and Wilson, did not preserve this issue, and thus has waived this issue for appeal.

¶115. Notwithstanding the waiver, we find no evidence that the jury was affected by passion or prejudice as a result of this limited testimony. *See* Miss. Code Ann. § 99-19-105(3)(a) (Rev. 2007). The jury was admonished in instruction C-2 not to "be influenced by bias sympathy or prejudice." The jury was instructed in its sentencing instructions to apply "reasoned judgment as to whether the situation calls for the imposition of death or life without parole, in light of the totality of circumstances present," and on its duties in finding and weighing any mitigating and aggravating circumstances, as well as the ultimate decision on the penalty. To find that the jurors permitted this limited testimony, when considering all the evidence presented, to influence them to the point of passion, bias, or prejudice, would require an assumption that they failed to follow the instructions given by the trial court. "This Court has held on numerous occasions that when a trial court instructs the jury, it is presumed the jurors follow the instructions of the court." *Williams v. State*, 684 So. 2d 1179, 1209 (Miss. 1996) (capital-murder conviction and sentence affirmed) (citing *Johnson v. State*, 475 So. 2d 1136 (Miss. 1985) (murder conviction affirmed)). In their answers, Pennie and LaQuandia stated what they would do if it were their decision, but did not implore, recommend, or attempt to incite or inflame the jury to follow their wishes. The answers, as related to suggested punishment, are very brief, a small part of their overall victim-impact testimony, which was otherwise unobjectionable under *Payne*, our statutes, and our caselaw. Pennie and LaQuandia testified about Felicia and how her murder had affected their family. In *Payne*, the U.S. Supreme Court, although it was not dealing with this precise type of

59

testimony, found that a "brief statement did not inflame [the jury's] passions more than did the facts of the crime." *Payne*, 501 U.S. at 831-32. *See also* **State v. Young**, 196 S.W.3d 85, 111 (Tenn. 2006), *cert. denied*, 549 U.S. 1081, 127 S. Ct. 730, 166 L. Ed. 2d 567 ("The jury heard several minutes of victim impact testimony that it should not have heard. However, the trial court properly instructed the jury about how it was to consider this evidence. The jury is presumed to follow its instructions."). *See* **People v. Towns**, 675 N.E.2d 614 (Ill. 1996), *cert. denied*, 522 U.S. 826, 118 S. Ct. 87, 139 L. Ed. 2d 44 (1997). In **Towns**, a capital-murder conviction was affirmed, despite the court's finding that the VIS was improper under **Booth**, as the defendant, who did not object, had not been not prejudiced by the admission, due to the "overwhelming nature of the State's aggravating evidence . . . ." *Id.* at 621-22.

¶116. The grisly facts of this murder have been amply covered elsewhere. Therefore, we find no basis to conclude that this jury was infected or swayed by passion or prejudice as a result of hearing this testimony, and this issue is without merit.

> **XIII.** **The trial court erred in allowing Steven Hayne to testify in violation of MRE Rule 702 and the Due Process Clause of the State and Federal Constitutions.**

¶117. A week before a prior trial setting, the State notified the defendant that Dr. Steven Hayne would testify during the penalty phase. The trial court granted Moffett's request for a continuance to retain an expert pathologist to review Dr. Hayne's opinions. Moffett retained Dr. James Lauridson and subsequently filed a "Motion for Hearing to Exclude Scientifically Unreliable Testimony to be Offered by the State's Pathologist." The defense requested (1) a **Daubert** hearing prior to Dr. Hayne's testimony; (2) notice of such hearing

so Dr. Lauridson could attend; and (3) a ruling by the court on the admissibility of the testimony. *See **Daubert v. Merrell Dow Pharms., Inc.**, 509 U.S. 579, 589-97, 113 S. Ct. 2786, 2795-99, 125 L. Ed. 2d 469 (1993). The defense argued that Dr. Hayne's testimony regarding the timing of Felicia's injuries would be nothing more than speculation, as (1) the histological slides from Felicia's autopsy had been destroyed, and (2) the autopsy report was inadequately detailed.

¶118. Dr. Lauridson submitted an affidavit and later testified at the trial.[18] In his affidavit, he opined:

> I cannot make a definitive determination as to whether the child was conscious at the time of the injury to the genitalia, rectum, anus, and the hematoma of the temple area and bruising of leg. It is *possible* that she was unconscious at the time of the injury. The determination of consciousness cannot be made on the basis of autopsy.

(Emphasis added.) At trial, Lauridson testified that Felicia's cause of death was "strangulation in conjunction with her head injury." He opined that Felicia's injuries were "absolutely classic for strangulation," but agreed that, among children, it is difficult to distinguish strangulation from suffocation. He testified that, at death, active bleeding from an external injury stops, but some oozing of blood may continue postmortem. He admitted that, according to the hospital records, Felicia had active bleeding in the emergency room while her pulse and blood pressure were restored briefly. He stated that the primary method for determining whether an injury occurred antemortem or postmortem is through microscopic study of histological slides. He stated that this would be essential in judging

---

[18]Dr. Lauridson testified during the guilt phase, but was not recalled by Moffett for the sentencing phase.

61

the timing of injuries, as the "review would be incomplete without review of tissue slides." However, he conceded that active bleeding is another method for timing injuries.

¶119. At the **Daubert** hearing, the questioning went beyond Hayne's professional qualifications to testify as an expert pathologist based on his experience as a pathologist, and extended to credibility, *i.e.*, the number of times he had testified and his claim that never, up to that point, had a case been overturned on appeal related to his testimony. The defense was offered an opportunity to *voir dire* him on his professional expertise, but limited its questions to whether Dr. Hayne was certified as a forensic pathologist. Dr. Hayne replied that he was certified by the American Board of Forensic Pathology.

¶120. Dr. Hayne opined that strangulation was the most likely cause of death, but he could not rule out the possibility of suffocation. He opined that Felicia was conscious at the time of her vaginal injuries, concluding that the only injury that could have caused death, as well as the only one that could have resulted in unconsciousness, was strangulation. He detailed each separate injury and explained why it would not likely cause death or unconsciousness. Specifically, regarding her vaginal injuries, he stated that the estimated blood loss (100 milliliters) would not have been enough to render her unconscious, but would indicate active bleeding, thus proving that she was still alive at the time of those injuries. Regarding the timing of the injuries, Dr. Hayne opined that the vaginal injuries preceded the strangulation. He did not attempt to time the other injuries, as this would not be possible given the information available.

¶121. Moffett's cross-examination did not directly challenge Dr. Hayne's methods or conclusions, but focused on the lack of histological slides, the lack of detail in the autopsy

report, and the discrepancies between Hayne's opinions and Moffett's statements to Don Davis.

¶122. Following the hearing, the trial court found that, consistent with the requirements of *Daubert*, Dr. Hayne was qualified to testify regarding his opinions on "consciousness or unconsciousness and timing of injuries," and that the testimony would be relevant and reliable.

¶123. Prior to Dr. Hayne's sentencing-phase testimony, the defense did not *voir dire* Dr. Hayne. The court accepted him as an expert in forensic pathology. Dr. Hayne opined that Felicia's vaginal injuries were especially heinous, atrocious and cruel, and that they occurred while Felicia was alive and conscious. *See* Miss. Code Ann. § 99-19-101(5)(h) (Rev. 2007). Moffett's cross did not challenge Dr. Hayne's opinion on consciousness, but rather, focused on the differences between his testimony and that of Don Davis (relating Moffett's statements) and statements made by LaQuandia. At the sentencing phase, Moffett did not call any experts to refute Dr. Hayne's methods or opinions.

¶124. Moffett argues that, because of alleged deficiencies in the autopsy report and the lack of histological slides, Dr. Hayne's testimony could not possibly have met the requirements of rule 702, as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

M.R.E. 702. Nothing in the record suggests that Dr. Hayne relied on anything other than his knowledge, skill, experience, training, and education, upon the facts and data presented in this case, using reliable principles and methods and applying them to formulate his opinions. His testimony regarding active bleeding as one method to determine whether an injury occurred antemortem or postmortem, as an alternate means when histological slides are unavailable, was conceded by Moffett's own expert, Dr. Lauridson. Moffett's argument goes to weight of evidence, not admissibility.

¶125. We find that the trial court did not err in finding that the testimony was "ground[ed] in the methods and procedures of science" and was "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

¶126. Moffett next argues that Dr. Hayne is not certified by a statutorily required board, but the statute he cites applies to the State Medical Examiner appointed by the Commissioner of Public Safety, not to every pathologist. *See* Miss. Code Ann. § 41-61-55 (Rev. 2009). Moffett further argues that Dr. Hayne is not qualified to testify, because, in cases in which he has testified: (1) this Court has reversed convictions, (2) defendants have been exonerated, and (3) his opinions have been found not to be supported by facts. *See Treasure Bay Corp. v. Ricard*, 967 So. 2d 1235, 1242 (Miss. 2007); *Edmonds v. State*, 955 So. 2d 787, 791-92 (Miss. 2007); *Brooks v. State*, 748 So. 2d 736, 738 (Miss. 1999); *Brewer v. State*, 725 So. 2d 106, 115 (Miss. 1998). This Court held recently that a trial court did not abuse its discretion in allowing Dr. Hayne to testify as an expert. *Lima v. State*, 7 So. 3d 903, 907-08 (Miss. 2009). Lima had claimed, *inter alia*, that Hayne's testimony lacked reliability and that he was not certified in forensic pathology by the American Board of Pathology. *See id.* at

907 n.2.  The *Lima* Court found that Dr. Hayne "exhibited sufficient 'knowledge, skill, experience, training, or education'" and found "nothing in the record to suggest that Dr. Hayne's testimony was not based on 'sufficient facts or data.'" *Id.* at 907.

¶127.  Thus, Moffett is due no relief regarding this assignment of error.

**XIV.        The trial court erred in refusing instruction DS-10.**

¶128.  Moffett argues that refusing proposed jury instruction DS-10 was reversible error. The instruction reads: "The Court instructs the jury that if you cannot, within a reasonable time, agree as to punishment, the Court will dismiss you and impose a sentence of imprisonment for life without the benefit of parole."  The trial court refused DS-10.

¶129.  This Court has dealt with this issue on several occasions.  In *Smith v. State*, 729 So. 2d 1191, 1220-21 (Miss. 1998), this Court held that the determination of whether a jury has deliberated for a "reasonable time" is within the discretion of a trial judge.  *Id.* at 1221.  The *Wilcher* Court found that "there is no authority for allowing the jury to determine what constitutes a 'reasonable time' for deliberations.  Moreover, even if the jury had never been instructed on what would happen if they could not agree, there would have been no error." *Wilcher*, 697 So. 2d at 1106.  *See also* ***Stringer***, 500 So. 2d at 945.  The jury was fully and fairly instructed on this concept by instruction DS-25, which stated, "If after reasonable and conscientious consideration of the evidence, and your duties as jurors, you cannot reach a unanimous decision concerning the appropriateness of sentencing Mr. Moffett to life in prison or death, you must cease deliberations and notify the Court . . . ."  We find no error in refusing jury instruction DS-10.

**XV.** **The trial court erred by refusing proposed instruction informing the jury that life was in their discretion, and that a jury always has the discretion to give a life sentence.**

¶130. Moffett argues that in refusing proposed jury instruction DS-20, the trial court violated Moffett's due-process rights under the Fourteenth Amendment and his Eighth-Amendment right to individualized sentencing. DS-20 reads:

> You are to begin your deliberations with the presumption that there are no aggravating circumstances that would warrant a sentence of death, and the presumption that the appropriate punishment in [this] case would be life imprisonment. These presumptions remain with Mr. Moffett throughout the sentencing hearing, and can only be overcome if the prosecution convinces each one of you, beyond a reasonable doubt, that death is the only appropriate punishment.

The trial court stated, "The Court doesn't believe that's the correct law, and also it's very confusing."

¶131. "[W]e have repeatedly said that we reject the 'proposition that a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment.'" *Brown*, 890 So. 2d at 919-20 (quoting *Watts v. State*, 733 So. 2d 214, 241 (Miss. 1999)). *See also Jackson v. State*, 684 So. 2d 1213 (Miss. 1996); *Chase v. State*, 645 So. 2d 829, 860 (Miss. 1994). Here, as in *Brown*, the jury was adequately and correctly instructed. *See Brown*, 890 So. 2d at 919. Instruction DS-24 informed the jury of the option of returning a verdict of life imprisonment without eligibility for parole. We find no error in refusing proposed jury instruction DS-20.

**XVI.** **The trial court erred in proceeding directly into the sentencing phase following the guilty verdict based on the unique circumstances of this case.**

66

¶132. Moffett submitted a pretrial motion requesting a twenty-four-hour cooling-off period before beginning the sentencing phase. The court deferred a decision until trial, stating "The Court will just make the best judgment it can based upon the existing status of the trial." Moffett cites law-review articles and the laws of other states, arguing that this State should adopt a requirement for a minimum cooling-off period. Our law requires that the "separate sentencing proceeding . . . be conducted by the trial judge before the trial jury as soon as practicable." Miss. Code Ann. § 99-19-101(1) (Rev. 2007). Our caselaw grants trial judges "broad discretion in determining how long trials last on any given day." *McGilberry v. State*, 741 So. 2d 894, 919 (Miss. 1999) (citing *Edge v. State*, 393 So. 2d 1337, 1342 (Miss. 1981)). This Court has affirmed death sentences when the recess between the trial phases was as short as fifteen minutes. *See Conley v. State*, 790 So. 2d 773, 800 (Miss. 2001); *McGilberry*, 741 So. 2d at 919. "[T]here is no bright line rule as to when a judge should grant a continuance or a recess, and this Court's analysis must focus on the unique facts of the case." *Sipp v. State*, 936 So. 2d 326, 332 (Miss. 2006) (citing *Hooker v. State*, 716 So. 2d 1104, 1113-14 (Miss. 1998)).

¶133. On the final day of trial (and the fifth day of juror sequestration), Saturday, February 25, 2006, the jury was instructed to be ready to resume at 9:00 a.m. After the closing arguments, the jury retired to deliberate on the guilt phase at 3:23 p.m. and returned a guilty verdict at 7:45 p.m. Immediately after the jurors were polled, the trial court asked if the parties were ready to proceed to the sentencing phase. The jury was excused while the instructions were reviewed. The trial court and counsel discussed (1) instructions, (2) the availability of the State's witnesses, and (3) the impropriety of shackling Moffett during the

67

sentencing phase. Before the jury was recalled, the trial court asked again if the parties were ready. The State answered that it was ready, but the defense was silent. Moffett did not object to proceeding, renew his motion for a cooling-off period, seek a recess or continuance, move to make an inquiry of the jury, or report to the trial judge that either he or his attorneys were too tired or otherwise not ready to proceed. After the jury returned, the State called its first sentencing-phase witness. At completion of the sentencing phase, the jury retired to deliberate at 11:20 p.m. without Moffett offering an objection to proceed, renewing the motion for cooling off, seeking an evening recess or continuance, seeking to inquire of the jury, or reporting that he or his attorneys needed relief. The jury returned its verdict at 12:24 a.m., Sunday morning, February 26, 2006.

¶134. Moffett argues, without offering proof, that this death sentence, under these circumstances, must have been the result of passion or prejudice, and is in violation of Moffett's right to "present his case within reasonable hours and under reasonable circumstances." *Parker v. State*, 454 So. 2d 910, 912 (Miss. 1984). *See Gregg v. Georgia*, 428 U.S. 153, 166-67, 96 S. Ct. 2909, 2922, 49 L. Ed. 2d 859 (1976); Miss. Code Ann. § 99-19-105(3)(a) (Rev. 2007). This Court recognizes that an attorney's participation in a trial is "mentally and physically exhausting. Trial courts should keep this in mind and not require attorneys, *over their objections, to continue beyond their limits . . . .* To do so deprives a [party the] . . . right to effective assistance of counsel . . . ." *Edge*, 393 So. 2d at 1342. (Emphasis added.)

¶135. In *McGilberry*, this Court affirmed a capital-murder conviction and death sentence. *McGilberry*, 741 So. 2d at 925-26. The *McGilberry* Court found that the trial court had not

68

abused its discretion by denying an overnight recess, as "[The defendant]'s counsel did not assert that he needed a longer break in order to adequately prepare for the sentencing portion of the trial." *Id.* at 919.

¶136. This Court has affirmed convictions, including for capital murder, when a defendant has raised this issue, or one like it. *See Hodges v. State*, 912 So. 2d 730, 768 (Miss. 2005) (capital murder) (*disagreed with on other grounds by Ross v. State*, 954 So. 2d 968, 987-88 (Miss. 2007)); *Conley*, 790 So. 2d at 799 (capital murder); *Hooker*, 716 So. 2d at 1114 (murder); *Lanier*, 533 So. 2d at 485 (capital murder); *Fairley v. State*, 483 So. 2d 345, 346-48 (Miss. 1986) (murder); *Dye v. State*, 498 So. 2d 343, 344 (Miss. 1986) (murder); *Bullock v. State*, 391 So. 2d 601, 611 (Miss. 1980) (capital murder).

¶137. The judgments in this area that have been reversed may be divided into two categories: (1) those in which the issue was ineffective assistance of counsel due to attorney fatigue; and (2) those in which the jury's verdict was seen as suspect due to unreasonable timing. *See Fairley*, 483 So. 2d at 347-48 (distinguishing several cases). In *Thornton*, the defense requested a recess at the close of the State's case at 6:00 p.m. *Thornton*, 369 So. 2d at 506. That motion was overruled, as well as a renewed motion at 10:00 p.m. despite the lawyer's complaint that he was exhausted, ill, elderly, and accustomed to going to bed at an early hour. *Id.* He was unable to complete his closing argument and had to be taken to the hospital to be treated for a heart attack. *Id.* This Court reversed, finding ineffective assistance of counsel. *Id.* at 507. *Parker* was similar in that the trial court denied multiple motions for recess despite the defense attorneys' protestations of exhaustion. *Parker*, 454 So. 2d at 911. In *Parker*, this Court reversed and remanded for a new trial when three

motions for recess were denied despite defendant's attorneys' claims, *inter alia,* that (1) they were exhausted from trying a lunacy proceeding, as well as the subject case the same day, and (2) the defendant was exhausted and should not be subjected to direct and cross-examination. *Parker*, 454 So. 2d at 911.

¶138. In the cases in which convictions have been affirmed, this Court has found distinctions with one or more of the above cases. *See Hodges*, 912 So. 2d at 768 (no evidence of any difficulty proceeding by the attorneys or jury); *Hooker*, 716 So. 2d at 1114 (no evidence of ineffective assistance of counsel; verdict not suspect); *Lanier*, 533 So. 2d at 485 (no evidence of old age, illness, fatigue, or exhaustion affecting defense attorney); *Fairley*, 483 So. 2d at 346 (court policy to allow sequestered jurors to keep working); *Dye*, 498 So. 2d at 344; *Bullock*, 391 So. 2d at 611 (lawyer was not elderly or ill and did not complain of fatigue).

¶139. Moffett once again argues that *Goff* should apply. *See Goff*, 14 So. 3d at 640. Moffett filed a non-fact-specific pretrial motion, requesting a recess between the guilt and sentencing phases. Moffett now argues that this filing preserved all recess issues for appeal, despite the lack of a contemporaneous objection or renewal of the motion. *Goff* concerned a specific issue regarding the admission of evidence found in a vehicle. *See id.* In *Goff*, the motion to suppress was denied. *Id.* The circumstances herein are quite different, where a decision on Moffett's motion was deferred until the court could "make the best judgment it [could,] based on the existing status of the trial." When that time came, the Court asked the parties on two occasions whether they were ready to proceed. Moffett offered no objection or complaint on either occasion. *Goff* clearly does not apply. Here, "the primary purposes of the contemporaneous objection rule – to permit the trial court to accurately evaluate the

70

legal issues and to enable the appellate court to apprehend the basis of the objection" are not satisfied. *Id.* The issue presented pretrial – whether a recess should be granted in the abstract and as a matter of law – and the issue at trial – whether a recess should be granted under the circumstances that existed at that time – are entirely different questions. Thus, we find the issue was not preserved for appeal. In the case sub judice, Moffett's attorneys did not object, seek a recess, or claim that they, the defendant, or the jury would be adversely affected by proceeding. We will not hold a trial court in error for issues not presented to it for ruling. *See Mills*, 467 So 2d. at 931.

¶140. We find no error, for the trial court was within its broad discretion to proceed without complaint or objection of the parties, their counsel, or the jury.

**XVII.     The death sentence in this case must be vacated because the indictment failed to charge a death-penalty eligible offense.**

¶141. Moffett argues that the indictment failed to include a valid statutory aggravating factor, thus, the State failed to charge all elements necessary to impose the death penalty. The indictment states:

> willfully, unlawfully and feloniously kill and murder [Felicia] Griffin, a human being, and a child within the meaning of Section 43-21-105(m), Mississippi Code, 1972, as amended, while he, the said Eric Moffett, was . . . engaged in the commission of felonious abuse and/or battery of [Felicia] Griffin, in violation of Section 97-5-39(2), Mississippi Code, 1972, as amended, contrary to and in violation of Section 97-3-19(2)(f), Mississippi Code, 1972, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi.

Moffett cites *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004); *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); and

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). This Court has held repeatedly that *Apprendi* and its progeny do not apply to indictments. *See Loden*, 971 So. 2d at 564-65; *Havard*, 928 So. 2d at 801; *Berry*, 882 So. 2d at 172 ("First, like *Apprendi,* the *Ring* Court specifically noted that its opinion did not address the constitutionality of the indictment; and therefore, it never spoke to whether states are required [to] provide such charges in their indictments.") Recently this Court stated the following regarding indictment requirements:

> The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense. An indictment is required only to have a clear and concise statement of the elements of the crime with which the defendant is charged.
>
> Under Mississippi law, the underlying felony that elevates the crime to capital murder must be identified in the indictment along with the section and subsection of the statute under which the defendant is being charged. In addition, "[o]ur death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment."
>
> When [the defendant] was charged with capital murder, he was put on notice that the death penalty might result, what aggravating factors might be used, and the *mens rea* standard that was required.

*Goff*, 14 So. 3d at 625 (citations omitted).

¶142. As Moffett's arguments are without merit, we find that he is entitled to no relief on this assignment of error.

> **XVIII.    Error in submitting and/or defining aggravating factors.**

¶143. The jury found two aggravating circumstances:

> (a)    The capital offense was committed while the defendant was engaged in the commission of felonious abuse and/or battery of a child;

72

(b)     The capital offense was especially heinous, atrocious or cruel.

¶144.   Moffett incorporates his argument on Issue XVI into the argument that the "especially heinous, atrocious, or cruel" aggravator ("HAC") should not have been submitted to this jury. He then adds the following arguments: (1) considering Issue XIII, insufficient evidence supports the jury's HAC finding; (2) the limiting instruction regarding HAC was unconstitutionally vague; (3) submission of the child-abuse aggravator, along with HAC, fails to narrow the class of death-eligible defendants; and (4) that this Court should reconsider its holdings that an underlying crime may be used as a capitalizer and an aggravating circumstance.

¶145.   This Court has held that *Apprendi* and *Ring* do not apply to Mississippi's capital-sentencing scheme. *Bennett v. State*, 933 So. 2d 930, 955 (Miss. 2006). Mississippi's maximum penalty for capital murder is death. *See* Miss. Code Ann. § 99-19-101(1) (Rev. 2007). As the death penalty is not beyond the statutory maximum for Moffett's crimes, reliance on *Apprendi* and *Ring* is misplaced. *Bennett*, 933 So. 2d at 955.

¶146.   Moffett argues that insufficient evidence supports the jury's HAC finding, considering the requirement that each aggravating circumstance be proven beyond a reasonable doubt. *See White v. State*, 532 So. 2d 1207, 1220 (Miss. 1988) (citing *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S. Ct. 2781, 2791, 61 L. Ed. 2d 560 (1979)). When this Court considers sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Roche v. State*, 913 So. 2d 306,

314 (Miss. 2005) (quoting *Jackson*, 443 U.S. at 315). The jury heard testimony regarding Felicia's atrocious injuries and the abhorrent manner of her death.

¶147. This Court has held repeatedly that similar instructions meet constitutional standards, as they "narrow[] the aggravating circumstance of 'heinous, atrocious or cruel' and thereby channel[] the jury's sentencing discretion in a principled way." *Bennett*, 933 So. 2d at 955-56 (quoting *McGilberry*, 843 So. 2d at 28) (citing seven cases with the "exact narrowing instruction").

¶148. Felonious child abuse is an underlying felony, as well as an aggravator, in Mississippi's capital-sentencing scheme. *See* Miss. Code Ann. §§ 99-3-19(2)(f), 99-19-101(5)(d) (Rev. 2007). Felonious child abuse and the HAC aggravator have distinct elements. *See* Miss. Code Ann. §§ 97-5-39(2)(a) (Rev. 2006), 99-19-101(5)(h) (Rev. 2007); *Bennett*, 933 So. 2d at 954. We have affirmed cases in which both felonious child abuse and HAC have been found by a jury. *Id.* (citing *Stevens v. State*, 806 So. 2d 1031, 1045, 1060 (Miss. 2001); *Brown v. State*, 798 So. 2d 481, 501-03 (Miss. 2001)).

¶149. This Court has held many times "that evidence of an underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance. *See Ross*, 954 So. 2d at 1014 (citing five cases). The United States Supreme Court has held that use of an underlying felony as an aggravator is not a constitutional error. *See Tuilaepa v. California*, 512 U.S. 967, 971-72, 114 S. Ct. 2630, 2634-35, 129 L. Ed. 2d 750 (1994); *Lowenfield v. Phelps*, 484 U.S. 231, 233, 108 S. Ct. 546, 548, 98 L. Ed. 2d 568 (1988).

¶150. Moffett's arguments are without merit. We find that he is due no relief on this assignment of error.

XIX. **Whether the cumulative effect of the errors in the trial court mandate reversal of the conviction or sentence of death.**

¶151. This Court's analysis of cumulative error is guided by the following:

[U]pon appellate review of cases in which we find harmless error or any error [that] is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect.

*Byrom v. State*, 863 So. 2d 836, 847 (Miss. 2003). "The question . . . is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial." *Id.*

¶152. Moffett asserts that errors by the trial court, combined with the "State's provocation and exploitation of [the errors] served to prejudice the defendant [and revealed] a disturbing pattern of repeated 'sharp practices' and dishonesty by the prosecuting attorney in this matter." Moffett cites three Court of Appeals cases in support of his argument. *See Whitehead v. State*, 967 So. 2d 56, 66 (Miss. Ct. App. 2007); *McGee v. State*, 953 So. 2d 241, 246 (Miss. Ct. App. 2007); *Davis v. State*, 970 So. 2d 164, 169-75 (Miss. Ct. App. 2006). We have identified no reversible errors.

¶153. The factors to be considered in cumulative-error analysis "include whether the issue of innocence or guilt is close [emphatically, it is not], the quantity and character of the error [minimal], and the gravity of the crime charged [the highest order]." *Ross*, 954 So. 2d at 1018. None of these three factors supports a finding of cumulative error. The overwhelming weight of evidence against Moffett does not present a close question. "I choose . . . not . .

. to close my eyes to the reality of overwhelming evidence of guilt fairly established." *Goff*, 14 So. 3d at 677 (Randolph, J., specially concurring, joined by Carlson, P.J., Dickinson, Lamar, and Pierce, JJ.) (citing *Milton v. Wainwright*, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178, 33 L. Ed. 1 (1972)). The crime proven beyond any reasonable doubt to a jury of Moffett's peers was the heinous, atrocious, and cruel murder of a five-year-old child, committed while in the commission of felonious abuse and/or battery. "'[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.'" *Payne*, 501 U.S. at 827 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S. Ct. 330, 338, 78 L. Ed. 674 (1934) (*overruled on another issue by Malloy v. Hogan*, 378 U.S. 1, 17, 84 S. Ct. 1489, 1498, 12 L. Ed. 2d 653 (1964))). Thus, we find that Moffett was not deprived of a fundamentally fair and impartial trial.

XX.        Section 99-19-105(3) Review

¶154.  We examine all death penalty cases with heightened scrutiny. This standard includes:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's . . . finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant . . . .

Miss. Code Ann. § 99-19-105(3) (Rev. 2007).

¶155.  Moffett advances a number of nonpersuasive arguments that the jury must have been affected by passion and/or prejudice, alluding to many of the issues we have rejected. The

jury was instructed to apply its "reasoned judgment" and not be influenced by "bias, sympathy, or prejudice . . . ." We find no support in the record that the death sentence was "imposed under the influence of passion, prejudice or any other arbitrary factor . . . ." Miss. Code Ann. § 99-19-105(3)(a) (Rev. 2007).

¶156.  The jury found unanimously, beyond a reasonable doubt, that Moffett committed the capital offense while engaged in the commission of felonious abuse and/or battery of a child, and that it was especially heinous, atrocious or cruel.  *See* Miss. Code Ann. § 99-19-101(5) (Rev. 2007).  Evidence, fairly established, satisfied the jury beyond reasonable doubt that Felicia Griffin, a five-year-old girl, was viciously assaulted, asphyxiated, beaten, and ravaged.  Her sister witnessed the beginning of the crime, and others testified to the resulting butchery of the crime.  Moffett described the mutilation of Felicia in graphic detail to a cellmate.  The attack left the child in cardiac arrest and with petechial hemorrhages, and bruises on her neck, head, and leg.  Her vagina was torn completely through to her anus.  In addition to Moffett's confession to Don Davis, scientific evidence, including DNA, supported the jury's decision.  A policeman, a paramedic, Dr. Castilla, Dr. Hayne, and Dr. Lauridson testified regarding the extent of Felicia's injuries.   We find that, given the evidence presented, there can be no doubt that a "rational trier of fact could have found" both aggravating circumstances "beyond a reasonable doubt." **White**, 532 So. 2d at 1220.  *See* Miss. Code Ann. § 99-19-105(3)(b) (Rev. 2007).

¶157.  After the separate sentencing hearing, the jury determined unanimously beyond a reasonable doubt that Moffett had actually killed, intended that a killing take place, and contemplated that lethal force would be employed.  *See* Miss. Code Ann. § 99-19-101(7)

77

(Rev. 2007). After weighing the aggravating circumstances against the mitigating circumstances,[19] the jury found unanimously beyond a reasonable doubt that the aggravating circumstances outweighed any mitigating circumstance. *See* Miss. Code Ann. § 99-19-101(5) (Rev. 2007). The jury determined unanimously, beyond a reasonable doubt, that death by lethal injection was the appropriate sentence. From the evidence presented, and this State's law, we find the death penalty was not a disproportionate or excessive sentence when compared to other capital-murder cases affirmed by this Court. *See Havard*, 928 So. 2d at 778-79; *Evans v. State*, 725 So. 2d 613, 633, 708 (Miss. 1997); *Williams*, 684 So. 2d at 1210). *See* Miss. Code Ann. § 99-19-105(3)(c) (Rev. 2007).

## CONCLUSION

¶158. We affirm the conviction and sentence of death.

¶159. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY.**

---

[19]Moffett presented no mitigating evidence except the testimony of an expert "in corrections and classification of inmates," who testified that Moffett would be a likely victim of violence in prison, but would be an unlikely perpetrator of violence.

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Goff v. State,* 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State,* 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So. 2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999).

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi,* 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987**), Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

*Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCING PHASE

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED**
**AS TO PUNISHMENT AND REMANDED**
**FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* **Wiley v. Mississippi**, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to **Wiley v. Puckett**, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984). *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.